## DAVENPORT v. BARTLETT & WARING.

9  179
125  587

1. A vendee of land, with warranty of title, may purchase in an oustanding paramount title, or incumbrance, and may recover upon his warranty without an actual eviction; but in such a case, he acts at his peril, and assumes the burden of proving, that he submitted to a good title, paramount to that of the warrantor.

2. D, in a suit in Chancery, instituted by him against C and others, obtained a decree for the possession of certain lands, which C had previously sold with warranty, and which were purchased with warranty by B & W; the same decree requiring D to pay C a sum of money, and giving to C a *lien* on the land for its payment. C being liable to B & W on his warranty, and being insolvent, and a non-resident: Held, that a Court of Chancery would give relief, and direct the money due from D to C, to be paid to B & W, they having to quiet their title, purchased from D his interest in the decree.

3. When a decree *pro confesso* has been taken for want of an answer, and a full and complete answer is afterwards filed—*Quere?* does not this of itself, under the statute, set aside the decree, *pro confesso*, and purge the contempt, without any order of the court to that effect. But an answer filed under such circumstances, comes too late at the trial term, and after the master has reported, unless by consent of parties.

4. A decree in Chancery is conclusive as between parties, and privies to the bill as to all matters which were put in issue, and cannot be collateral-

Davenport .v. Bartlett & Waring.

ly impeached. *Quere?* Might not a clear clerical mistake be considered as amended, even when the decree. came collaterally in question.

5. A decree that D is entitled to certain lands, and that he be let into the possession, charged with the payment to C of a sum of money, does not make C a mortgagee of the lands.

6. A mortgagee who is not in the actual perception of rent, and does not intermeddle with the property, cannot be charged with rent.

7. Where one is made a party. to a bill, by an amended bill, which does not admit that he is an assignee in bankruptcy, but suggesting that he claims some interest in the subject matter, and he appears, and does not answer the bill, but merely demurs to it, the only effect is, to question the right to make him a party to the litigation, and upon the demurrer being decided against him, taking no further steps, must be understood as having abandoned the pursuit of the claim.

8. In general, an amendment of a bill has the effect to destroy the prior proceedings for a contempt. But where one who had been in contempt, after the amendment of the bill, failed to file his answer, until after the master had reported, and especially in a case where he appeared before the master, and had all the benefit he could have derived from an answer, the objection that a formal decree *pro confesso* was not entered, will not be allowed at the hearing, or in this court.

9. Where the Chancellor, in making his decree in favor of the complainant, extinguished a debt which he owed to the defendant, to which no objection was made at the time, it will be no reason for disturbing the decree, as it is manifestly to the interest of the defendant, and would not have been made if he had objected to it.

10. Matters of account must be brought before the master, and if rejected, excepted to, to enable the party to assign them as error.

11. Where non-resident defendants appear, and submit to the jurisdiction of the court, a refunding bond is not necessary.


Error to the Chancery Court of Mobile.


THE bill was filed by the defendants in error, on the 9th March, 1842, in which they alledge, that on the 2d May, 1834, Benjamin F. Copeland, being in possession, and claiming to be the owner, conveyed by covenant of warranty, to Remsen & Jude, all that portion of the Holman estate in Mobile, which lies east of Commerce street, (and which is particularly described,) for the consideration of $16,000; that Remson & Jude, on the 10th April, 1835, sold the same to complainants for $40,000; that they knew of no defect in

the title, relied on their warranty, and proceeded to make improvements—expending about $50,000.

That they sold a portion of the land so purchased to one Collins and Schuyler for $40,000, and have since discovered, that one Gorham Davenport claimed an equitable title to one half the premises, and before the time of their purchase, in the year 1832, had filed his bill in Chancery to recover it; claiming under one Charles Brown, and making Brown, Copeland, and the Bank of Norfolk, parties defendant; that Copeland answered the bill, and the cause came on to be tried at the fall term, 1837, of the Chancery Court, when a decree was rendered, establishing the right of Davenport, to the specific execution of a contract, made between him and Brown, and an account was ordered to be taken of the monies due by Davenport, as the balance of the purchase money on his contract, when it was found, and decreed by the Chancellor, that Davenport, should pay to Copeland $4,807 11, with interest from the 1st May, 1841, which was decreed a charge upon the estate, and that Davenport should be let into the possession of an undivided half of the land sued for, being the land conveyed to complainants, which decree remains in full force.

That being unwilling to be evicted, and apprehending that the warranties of Copeland and Remsen & Jude, would not be availing, they purchased the interest of Davenport for $6,000, and procured the release of his title; that Copeland resides in Boston, and that both he and Remsen & Jude are insolvent; that Copeland is now attempting to collect the amount of the decree against Davenport, by which means Copeland is about to make a gain to himself, by the breach of his warranty with complainants. Prayer, that Davenport and wife, and Copeland, be made defendants, that the latter pay the six thousand dollars to complainants, and they be decreed to have a *lien* on the decree in favor of Copeland, against Davenport, and for an injunction : an injunction accordingly was granted.

Decrees *pro confesso* were taken against Copeland and wife and Davenport.

On the 23d December, 1842, a commission issued to take the answers of Copeland and wife. In the transcript is found an answer of Copeland and wife, which was received by

the Register on the 7th February, 1843, and published in open court, April 3, 1843. By their answer, they disclaim all interest in the matter in litigation, setting forth, that Copeland has been duly declared a bankrupt; that all his rights have passed to his assignee, Francis Hilliard of Massachusetts, and pleads his discharge as a bar to any claim on his covenant of warranty.

On the 8th of April, 1843, the defendants moved to dismiss the bill for want of equity, which motion the court overruled, and directed the assignee of Copeland to be made a party to the bill, which he was directed to answer within sixty days, and publication ordered.

At the April term, 1844, Hilliard demurred to the bill, at which term the demurrer was overruled, and by consent a reference was directed, to state an account, the master stated an account, which on motion and petition of Davenport, was set aside upon the ground that he had a right to appear before the master, and offer evidence touching the account, and the matter was referred back to the master.

In the transcript there is found an answer of Davenport, filed 1st April, 1845, and sworn to on the 7th of that month, giving an elaborate account of the various purchases by him, and others, of the land, and charging, that in the decree rendered in the suit instituted by him against Brown and others, there was a mistake; that he was not then, and is not now indebted to Copeland in the sum of $4,807 11, decreed to him, or in any sum whatever, and proceeds to state how the alledged mistake of the master originated.

On the 26th March, 1845, the master made his report, in which he found, that Davenport was indebted to Copeland, in the sum of $4,807 11, being the amount found by the former report, and refused to allow Davenport the rent of three stores, on Water street, Copeland having been ejected from two of them, by a paramount title, and the other having been burned down, and not rebuilt, although the insurance money had been received, sufficient to erect the buildings.

To this report Davenport excepted, and the exceptions were overruled by the Chancellor, who proceeded to make his decree. The Chancellor then determined, that the answers of Davenport and Copeland could not be considered,

because it did not appear that the decrees *pro confesso* had been set aside, or any leave‑given to file the answers, although the answer of Copeland was filed prior to April term, 1843, and that, by agreement, the cause was heard on demurrer, and referred to the master, and that it was too late now to file the answers. He further determined, that Copeland was not chargeable with rent, and that complainants were entitled to recover of Davenport the amount found to be due from him to Copeland, deducting therefrom the amount of a note of $811 38, still due to Davenport, from the complainants on their purchase of his interest in the land.

The plaintiffs in error assign the following‑errors: 1. In overruling the motion to dismiss for want of equity.

2. In overruling the demurrer to the bill.

3. In rejecting the answers of Davenport, and Copeland and wife.

4. In proceeding in the cause after the death of Bartlett, without making his heirs parties.

5. In overruling the exceptions to the master's report.

6. In the decree made.

K. B. SEWALL, for plaintiff in error—

The answers of Copeland and wife, and Davenport, were properly filed. The court acted upon the answers of the former, in making the assignee in bankruptcy a party. The parties were not in contempt, either under the English practice, or our statute, and the contempt, if any, was cured by the amended bill. [2 Con. 411; 1 R. & M. 323.]

The heirs of Bartlett were necessary parties, as it does not appear that the property belonged to the partnership.

The complainants are not entitled to relief, as there has been no eviction, and indeed could be none, as the complainants alledge that they purchased from Holman's heirs the paramount title. [1 Johns. C. 218; 1 A. K. M. 318; 1 Dana, 305.]

If complainants claim as assignees of Copeland, assignee of the mortgage, then their purchase from Davenport, the mortgagor of the land, on which the mortgage debt was a lien, extinguished the mortgage debt. [7 Paige, 248; 1 Bailey Eq. R. 334.]

If complainants are not assignees of the mortgage, then neither they, nor Copeland, have· any right or interest in the mortgage debt due from Davenport to Brown—they acquired under Copeland, merely a defeasible title to an undivided moiety.   [2 Sum. 129.]

In taking the account, Davenport is entitled to half the rents and profits of the three stores, west of Water street. Copeland, and those purchasing from him, came into possession pending the suit of Davenport against Brown, and are affected with notice.   The rule is, that the mortgagee in possession, and those claiming under him, must account for the rents and profits.   [1 Madd. 155, 290 ; 5 Vesey, 99 ; 5 Paige, 9 ; 3 Russ. 458 ; 4 Vesey, 118, 481 ; 10 Id. 405; 5 Pick. 146 ; Coote on M. 315, 320 ; 1 Johns. C. 385; 1 Paige 202.]   The rents and profits are incidents *de jure* to the ownership.

A mortgagee selling without the consent of the mortgagor, is chargeable with rents and profits, subsequent, as well as prior to the conveyance.   [Coote on Mort. 315, 320 ; 4 Ves. 118; 2 Sum. 155.]   All the sales from Brown and Copeland were made without the knowledge of Davenport.

Assignee of mortgagee cannot set up adverse title against the mortgagor.   [2 Sum. 146.]

Mortgagee, or those claiming under him, in possession, are bound to keep the premises in repair.   [2 J. J. M. 465 ; 2 Y. & C. 117.]

Davenport could not get possession under the decree of 1841, Holman's heirs, claiming by title paramount, were in possession of two of the stores, and if, because Copeland's title to complainants failed, they are entitled to relief—for the same reason, Davenport is entitled to relief against Brown, his title also having failed.

The bankruptcy of Copeland is a bar to any relief, as his interest passed to the assignee in bankruptcy, and the bill was filed after his petition.

If Copeland acquired an interest in the debt due from Davenport to Brown, by reason of his purchase from Brown, then by virtue of his absolute sale, on the 3d February, 1836, his right passed to his assignees, and so far as the complainants acquired any right by virtue of their purchase of a portion,

Davenport v. Bartlett & Waring.

by their compromise with Davenport, they extinguished that right.

The decree in favor of Copeland, upon the bill filed by Davenport against Brown was evidently a mistake, and the record furnished the means of correcting it. Such a decree could not be made to Copeland in his own right, and he must be understood as the mere representative of Brown.

Davenport had the right at the reference to surcharge, and falsify, the account of May, 1841, and he pointed out a specific error and mistake, which affected the merits of the case. [3 Edwards, 73.]

The rents and profits claimed by Davenport, arise upon the three lots west of Water street, improved by Davenport and Brown, in 1827. The purchase of the complainants was east of Water street.

There is no ground whatever shown for enjoining the note for $811 38 due from complainants to Davenport; he is not alledged to be insolvent, and if he is indebted to Copeland, it furnishes no reason for the injunction. Besides, Davenport is liable for the costs of the suit instituted by him.

STEWART, contra, relied on the following principles—

1. Equity affords relief by attachment to recover equitable demands, by analogy to the statute attachment law. [7 Ala. Rep. 217.] Copeland is both a non-resident and insolvent.

2. Equity will give a purchaser, as well as a vendor a lien on the land and its proceeds, to recover back the purchase money, when the contract fails, or he is entitled to a return of it.

3. Chancery will subrogate, and substitute a party, who is in reality entitled to a benefit which another is about to receive, and which in conscience he ought not to hold. [2 H. & J. 455.]

4. Chancery will not allow a party to derive a benefit from his own breach of contract.

The facts are, that Copeland sold and warranted to Remsen & Jude, who conveyed to complainants with warranty; it was then the duty of Copeland, to preserve the title. But

24

Davenport recovers from him, one half of the land, it is then the duty of Copeland to satisfy his demand, or pay complainant the loss. The recovery of Davenport was for half the land, less the sum of $4,807 11, and Copeland having parted with all his title, this was a fund to discharge his warranties.

The complainants are entitled to be subrogated to receive this money, as it arises out of, and runs with the land. The same judgment which creates a breach of Copeland's warranty, confers on him the right to this money. Can he profit by a breach of his contract, and that by the very same decree.

Although there has been no eviction in fact, equity will so consider it, because complainants have sustained the loss which he warranted against, without fault on their part. The decree in favor of Davenport is conclusive of the breach of his warranty, as complainants are concluded by it.

Neither Copeland, or Davenport, have answered the bill, as the decrees *pro confesso* were never set aside ; but the answer of Copeland on file, is a mere disclaimer of title, and the answer of Davenport, is an attempt collaterally to impeach the decree rendered in his favor, in his suit against Brown and Copeland. The assignee in bankruptcy, though a party, has merely demurred to the bill, but has not answered it, he has never put in issue his title as assignee in bankruptcy.

The claim for rent and profits cannot be sustained. The rents have been received by parties in possession, claiming the land as their own, and adversely to Copeland, though their title was derived from him. Davenport does not stand to these tenants in possession as mortgagor. His true attitude is rather that of mortgagee, as his title is derived from the decree, which gives him the right to the possession of the property. The decree merely gives to Copeland a lien on the land for the sum decreed to him, he has no right to the possession.

The death of Bartlett was not suggested to the court, and only appears in the answer of Davenport, which cannot be noticed.

The amendment of the bill was not a waiver of the decree

*pro confesso,* there was no amendment as to Davenport, and
no new answer was required of him.

Hilliard is no party to the writ of error, and cannot as-
sign error—nor can Copeland, as he disclaims all interest.

ORMOND, J.—The first question which naturally presents
itself, is, whether there is equity in the bill.

The object of the bill is to have the benefit of a covenant
of general warranty to land in the city of Mobile, executed
by Copeland, to Remsen *&* Jude, who sold and conveyed the
same land with warranty, to the complainants. It is not denied,
that there has been a breach of this warranty, but, it is in-
sisted that no action can be maintained for its breach, either
at law or in equity, because the complainants have not been
evicted from the premises.

The decree in favor of Davenport for one half of the prem-
ises, in the suit instituted by him against Brown, Copeland
land and others, would have been, if enforced by Davenport
an eviction by title paramount, and a breach of the warranty
of Copeland, he being the warrantor of the immediate vendor
and warrantor of the complainants; and his covenant running.
with the land, he would have been liable directly upon it to
them.

In Roebuck v. Dupuy, 7 Ala. Rep. 487, we intimated,
that the plaintiff might recover in an action upon a covenant
of warranty, though he had voluntarily yielded to a dispos-
session, provided the title to which he yielded was a good
title, and paramount to that of the warrantor; and upon ma-
ture reflection, and examination of the authorities, we are
satisfied that such is the law.   Why should the vendee be
compelled to involve himself in a law suit, when it is self-
evident he must be defeated?   What conceivable public or
private good is to be accomplished by such a course? None,
that we can conceive of, and we are therefore of the opinion,
that the covenantee has the right to purchase in the incum-
brance, or outstanding title, and sue the warrantor upon his
covenant.   The only difference in law, between his pursu-
ing this course, and submitting to an actual eviction, would
be, that in the former he would act at his peril, and would
assume the burthen of proving that he submitted to a good

title, paramount to that of the warrantor. [Hamilton v. Cutts, 4 Mass. 352; Sprague v. Baker, 17 Id. 586; Mackay v. Collins, 2 N. & McCord, 186; Furman v. Ellmore, Id. 189.]

No doubt whatever can exist, that the title to which the complainants submitted, and which they quieted by their contract with Davenport, was a title paramount to that they derived from Copeland, as the title and right to possession was decreed to Davenport, in a suit instituted by him, against Copeland and others. This decree, was in effect a breach of his warranty, as he is estopped from denying its correctness; as were also the complainants, as they purchased from Remsen & Jude, pending the litigation.

It is clear, then, upon the principles above laid down, that upon the purchase by the complainants from Davenport, of his title under the decree, they could have sued Copeland upon his warranty, and that these facts would have been a breach of his covenant. If this be the rule at law, much more will it be so in equity, which regards the substance, rather than the form of things.

The purchase by the complainants from Davenport, quieted their title, and secured to them the possession; but the decree gave to Copeland a *lien* upon the land, for the sum decreed to be paid to him by Davenport. The land was then to this extent incumbered, and Copeland being not only insolvent, but a non-resident, we think the complainants had the right to ask the aid of a Court of Chancery to extinguish this incumbrance, and to subrogate them to all the rights of Copeland under the decree. It cannot be doubted, that if Copeland were to call on a Court of Chancery to enforce this *lien*, it would be extinguished by the application to his demand of the claim of the complainants against him, on his warranty. This is, in effect, the true posture of the case, as the allegation of the bill is, "that Copeland is now using efforts for the collection of the said balance of purchase money, due from Davenport," and he being insolvent, as well as a non-resident, it would be beyond the reach or control of the complainants, unless the Court of Chancery interposed, and enjoined Davenport from paying it over to Copeland. It being therefore necessary, and proper,

that equity should interpose, for the preservation of the fund and having jurisdiction for that purpose, it will retain it for all purposes.

We think also, the jurisdiction of Chancery may be maintained, upon the equity of our attachment law. This question is fully considered in Kirkman v. Vanlier, 7 Ala. Rep. 226, where it was held, that an equitable demand might be attached in equity, in those cases where the law could not afford adequate redress. In the elaborate case of Donovan v. Fisk, Hop. 83, the Chancellor refused relief, expressly on the ground that no attachment law existed in that State, and that therefore he had no right to condemn a debt, due to one, to the payment of a debt due by him to another. This principle is familiar to our jurisprudence, the legislature having, by various enactments, created a system, by which the debts due to a debtor may be reached by his creditor. This principle being recognized, and engrafted upon our law, it is the duty of courts of equity to come in aid of the law, and make it effectual in all. cases where the right exists, and where, without such aid, it would probably fail.

The Chancellor directed an account to be taken, to ascertain the amount due from Davenport to Copeland, but before proceeding to the consideration of the questions arising upon the exceptions to the master's report, it is necessary to determine what were the issues presented.

Copeland, and Davenport, having failed to answer the bill, decrees *pro confesso* were regularly taken against them. After the rendition of this decree, an answer of Copeland and wife, taken by commission, and appearing to be in all respects regular, was received by the Register, through the post office, and filed in the cause, but no application was made to the Chancellor, for leave to file it, or to set aside the decree *pro confesso*. At the succeeding April term, the bill was amended by making one Hilliard, assignee in bankruptcy of Copeland, a party to the bill, who appeared and filed a general demurrer to the bill.

At the April term, 1844, the following entry appears : " By consent of parties, this cause comes before the court on a general demurrer to the bill, filed by Hilliard, the assignee of Copeland, who by an order of the last term has been made

a party, and it is agreed that if the demurrer be overruled, the matter must be referred to the master to state an account between the parties." The court then proceeded to render a decree, overruled the demurrer to the bill, and directed an account to be taken.

We will not now stop to inquire, whether the filing of an answer at any time before the cause is set for hearing, does not purge the contempt, and set aside the decree *pro confesso*, because it appears here, that by the consent of the parties, the cause was to be heard on a demurrer to the bill, and that if the demurrer was overruled, the court should direct an account to be stated between the parties. This, under the circumstances of this case, was an abandonment of the answer of Copeland, which indeed was a mere disclaimer of all interest in the controversy, alledging his bankruptcy, and appending his certificate as a bankrupt to his answer. So far as Copeland is concerned, it is wholly unimportant whether this answer is to be considered as regularly in or not, as the answer is a full disclaimer of all interest in the controversy, and an admission that Hilliard had succeeded to all his rights, and Hilliard being made a party, it devolved on him to assert the rights which had previously existed in Copeland. How the decree affects him will be hereafter considered.

The master proceeded to state an account, and made his report, which on the petition of Davenport was set aside, because the master had refused to permit him to appear before him at the stating of the account. He also asked permission to file an answer, to which request it does not appear from the record, the Chancellor responded, but granted him permission to appear before the master and contest the account. On the 26th March, 1845, the master again stated the account, and made his report, and on the 1st April after, Davenport filed in the office his answer.

At the hearing, the Chancellor refused to consider the answer, and in our opinion correctly. Whether Davenport is to be considered as a party to the agreement of April term, 1844 or not, it is clear that after the cause has been heard on its merits, and referred to the master for an account, it is too late for one in contempt, and against whom a decree *pro confesso* has been taken, to file his answer, unless by consent of

the parties, or by leave of the court. Here, the answer was not filed until after the last account was taken, the account being taken on the 26th March, 1845, and the answer not sworn to and filed until the 7th April, afterwards, during the term at which the cause was finally disposed of.

But in our opinion, the rejection of the answer was a matter wholly unimportant to Davenport. Its entire purpose was to impeach the decree rendered in his own suit. No proposition can well be clearer, than that this decree is conclusive as to all the parties to the bill, whilst it remains in force, and cannot be collaterally impeached. It was rendered in his own suit, conferring on him important benefits, clogged with certain conditions. He cannot be permitted to affirm that portion of it, which gives him a title to the land, and the right to its possession, and impugn the condition imposed of paying to Copeland the sum mentioned in the decree. It may be, that there is a mistake in the account then taken, caused as is alledged by a misapprehension of the master, but if such is the fact, it cannot be corrected in this suit. All who were parties, or privies, to the suit in which it was rendered, are estopped by it.

It is further urged, that this matter was not put in issue in that suit, and that therefore it is not *res adjudicata*, and does not estop Davenport from denying his indebtedness to Copeland.

The bill was filed by Davenport to set up a deed executed to him by Brown, for one half of the land purchased by Brown from the heirs of Holman; to this bill Brown and Copeland, and others, were parties. Copeland answered the bill, and alledged that he was a purchaser from Brown of one half the estate, without knowledge of the claim of Davenport. That he first took from Brown a mortgage on the land, and afterwards purchased the entire property from him.

The court, by its decree, set up the deed executed by Brown to Davenport, and which had been cancelled for a temporary purpose, and also set up the mortgage executed by Davenport to Brown, for the purchase money of the land. It declared that the deed from Brown to Copeland, should be held to convey only an undivided moiety of the land. It further declared, that the mortgage executed by Brown to

Copeland, on the 2d May, 1832, for nine thousand dollars, should be a charge upon the undivided moiety of Brown, and if insufficient then it should be an incumbrance on the undivided moiety of the complainant, (Davenport.) A reference was made to the master, to state an account, who reported, that there was due from Davenport to Brown $4,807 11, on his mortgage to the latter, and that there was $9000 due from Brown to Copeland, with interest from the date of the mortgage. The court also decreed, that the complainant, (Davenport,) pay to Copeland, the sum of $4,807 11, with interest, and that it remain a charge upon said estate.

It is now urged, that we must understand, that the name of Copeland was inserted in the decree by mistake for that of Brown. It is useless to consider, whether, in the case of a clear clerical mistake, a decree or judgment might not be considered as amended, when the question came up collaterally, as to the true meaning of the decree, because no such inference can be drawn in this case. Copeland, who was a party to the suit, claimed to be a purchaser without notice, and to have a right to the land paramount to Davenport, he also put in issue the mortgage from Brown to him, upon the land, which he claimed to be due to him. The court, by its decree, recognizes his right, and the amount due upon his mortgage, and having also ascertained that Davenport was indebted to Brown, it transferred this debt to Copeland. Whether the court was right in this, or whether either of these debts in fact existed, we shall not inquire. These were matters in issue between these parties, and they are now estopped from denying their correctness. That the Chancellor had power to decree, that the debt due from Davenport to Brown should be paid to Copeland, to whom Brown was also indebted, is too clear for argument. [Clay and Moore, et al. 7 Ala. Rep. 742.] But we abstain from the expression of any opinion, whether this power was wisely, or properly exercised. It was a matter adjudged, and passed upon by the court, in relation to a matter growing out of the proceedings instituted by Davenport himself, and put in issue by the answer of Copeland, and cannot be questioned in this collateral manner.

The decree then rendered was a final adjudication of these

matters, it settled, and was intended as a settlement of all these questions.   It gave to Davenport the immediate right of possession, charged with the payment of the sum mentioned, to Copeland, within the term of six months.   At the expiration of this time, an execution could have been issued by Copeland for the collection of the money.   Could Davenport have prevented the collection of this money, by the allegation that he was entitled to an account for rent, against Brown?   Most clearly not, because the account had been settled, and adjusted, and it would be solemn trifling, to say that the decree of the court for a precise sum, was liable to a reduction every day after it was made, upon the very same principle upon which it was made, and without any change of the facts existing when it was made.

It is said that Davenport has not been able to obtain possession of a portion of the property decreed to him.   The decree of the court operates, and was intended to operate, only on those who were parties to the suit.   The Chancellor could not, by any decree he could make, affect the rights of those who were not parties to the litigation.   The decree was rendered in May, 1841, and it appears from the evidence adduced before the master, that three years previously, the heirs of Holman had recovered the possession of two of the stores, with the rent of which it is attempted to charge Copeland, and have held them ever since, asserting a title paramount, both to Copeland and Brown.   The remaining store had been destroyed by fire previous to the rendition of the decree, and the insurance money paid to those who purchased it from Copeland.   Some small offices have been erected on the lot, but are not held under Copeland, or by his permission.   No fact exists now, which did not exist when the decree was rendered, and no act has been done by Copeland, which could make him responsible to Davenport for the rent of this property.

The decree securing to Davenport the possession, does not make Copeland a warrantor that he shall obtain the possession, whatever may be its effect upon Brown. The whole effect of the decree, as it regards this question, upon Copeland is, that Davenport's right, is paramount to his, to one undivided half. As, therefore, the parties cannot go behind the decree, and

25

impugn its correctness, and as Copeland has done no act since which can subject him to an account for the rent of property which he did not possess, or control, and which was held by a title adverse to him, we think the exception was properly overruled.

It is also, urged, that the decree, giving Copeland a lien on the land, for the sum decreed to be paid by Davenport to him, makes him stand in the relation of a mortgagee in possession to Davenport. This view is clearly incorrect. The decree did not give to Copeland the right to enter upon the land, but merely charged the land with the payment of the money, which could only have been rendered available, by application to a Court of Chancery, the right to the possession of the land having been decreed to Davenport. If, however, the effect of the decree was to place him in the attitude of a mortgagee, as in fact he did not enter upon the land, and take the profits, he cannot be charged with the rent. A reference has been made to cases, where a mortgagee has been charged with rent, which he did not receive, as where he has, without the consent of the mortgagor, placed an insolvent tenant in possession of the mortgaged estate. Here, there has been no act of interference whatever, on the part of Copeland, since the decree was rendered. The sale made by him of the property, was long anterior to the decree, under a title which he derived from Brown, and in ignorance of the claim asserted by Davenport, and the rent which, in the account which was taken in the suit of Davenport, was allowed to him, was against Brown, and not against Copeland. Whether that allowance was proper, or improper, is not a question in this cause. The decree, we repeat again, settled all these matters, and the only question now is, what has transpired since, authorizing a reduction of the sum decreed to Copeland, and as the response to this question is, that Copeland has done no act whatever, it follows that the decree must stand.

It is further urged, that all the interest of Copeland in this decree, passed to his assignee, upon his bankruptcy. It does not distinctly appear, that Hilliard, the assignee in bankruptcy, is prosecuting this writ. If, however, such was the fact, he has never put in issue the fact of the bankruptcy of Cope-

land, which is not admitted by the amendment to the bill, making him a party. His answer, setting up the bankruptcy of Copeland, was not sworn to, and filed, and was not received as an answer to the bill. As the amendment to the bill, making him a party, did not admit that he had an interest in the litigation, but called upon him to answer, and state what interest he had, the only effect of his demuurrer to the bill, was to question the right to make him a party to the litigation; it certainly did not put in issue the bankruptcy of Copeland. His course can admit of no other interpretation, than, that he abandoned the pursuit of the claim, as upon the demurrer being decided against him, he did not answer the bill, but according to the statement of the record, if indeed that portion of it applied to him, consented that the cause should be referred to the master, to state the account.

The amendment of a bill, has in general the effect to destroy the prior proceedings for a contempt. [1 Smith's Ch. P. 305.] It is insisted here, that the amendment, was one in which Davenport had no interest, and is not therefore within the rule as stated. We do not think so. The amendment was important to Davenport, because it introduced another party upon the record, who claimed, or might claim, the right to the money he owed Copeland. Although the amendment nullificd the process of contempt, it did not make it necessasary that another subpœna should issue, and the obligation still continued, to answer the bill. Instead of answering the bill, Davenport appears before the master, and contests the settlement of the account, and after the account was stated, and not until the term when the cause was finally heard, does he appear and file his answer. In our judgment, this must be considered as a waiver of his right to answer the bill. The decree *pro confesso* is quite a matter of form, and set aside upon the appearance of the party. In this case, Davenport is not in the slightest degree prejudiced by the rejection of his answer, as, in point of fact, he raised before the master, the defence set up by the answer. . Whatever, therefore, might be the general rule, in such a case as this, where the answer has not been filed until after the account was stated, and especially, because the answer, if received, could not in the least vary the decree, we think no objection can

be raised at the trial of the cause, or in this court, that a formal decree *pro confesso* was not rendered.

No suggestion was made to the court, of the death of Bartlett, except in the answer of Davenport, which was not received, or acted on, by the court, and cannot therefore be considered here,

Of the $6,000 which the complainants agreed to give Davenport, to quiet their title, and for his interest in the decree, it appears there was still due him $811 38, for which he held their note, and the Chancellor decreed that it should extinguish by that amount, the sum decreed to the complainants to be paid by Davenport, having at an early stage of the cause granted an injunction to his proceeding at law to enforce it. It might perhaps be well doubted, whether this injunction was properly granted, as it is not alledged in the bill, that Davenport is insolvent, and the complainants must have contemplated when they gave it, that it might be enforced before they had any claim on Davenport, as that depended on their being subrogated to the rights of Copeland. That decree has now been made, and we are at a loss to conceive, what possible benefit can result to him, from permitting this note to remain unsatisfied. It would seem, that if this is an error, it is one against the complainants, as their claim is reduced to a judgment, whilst his is but a *chose in action*. It is clearly for the benefit of the party who now complains of it, and at whose instance the Chancellor would have been authorized to make it against the objection of the complainant, as an extinguishment of so much of the debt. In this aspect, the Chancellor no doubt considered it, and if the offered benefit had been refused, it would doubtless have been omitted out of the decree, as the complainants could have had no motive in insisting upon it. We are clear in the opinion, that the decree should not be disturbed for this cause.

It is further objected here, that the account is incorrect, in not allowing to Davenport the costs which were decreed to be paid by Copeland and Brown, in the suit of Davenport against them and others. This point does not appear to have been raised before the master, or if raised, that an exception was taken for his refusal to allow it; it cannot therefore be

Davenport v. Bartlett & Waring.

considered here. In addition it may be remarked, that it does not appear for what portion of these costs Davenport is responsible, or whether he has, in fact, paid any part of it.

It appears that the complainants, in 1838, purchased the title of Holman's heirs, to the property they had previously purchased from Remsen & Jude, who purchased from Copeland. We are unable to see how this fact can be of any importance in this suit. The complainants do not rely upon it as the purchase of a title paramount to that of Copeland, and certainly Davenport has no right to object to it. His title was superior to that of the complainants, and if it be true that the title of Holman's heirs is paramount to all the rest, it would only show, that in their anxiety to fortify their title they had purchased from Davenport a title of no value. This however, is a matter which cannot enter into this inquiry. Whether the title of Holman's heirs is good or bad, is a matter with which Davenport has no concern or interest whatever, as it is not set up by the complainant against either him or Copeland.

This is not a case in which it was necessary to guard the interest of non-residents by a refunding bond, as was held to be necessary in Erwin v. Ferguson, 5 Ala. R. 167. Here it appears that Copeland appeared and moved to dismiss the bill; his answer too, is on file, disclaiming all interest in the controversy. Hilliard, the other non-resident, appeared and demurred to the bill, and consented, that if the demurrer was overruled, the master should state an account. These acts must be construed to be a voluntary submission by these parties to the jurisdiction of the court. They are not therefore in the predicament contemplated by the statute making a refunding bond necessary.

The result of our examination is, that the decree of the Chancellor should be affirmed.