LENA H. RABINOWICH *v.* LOUIS ELIASBERG ET AL.
[No. 37, October Term, 1930.]

*Decided December 4th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, DIGGES, PARKE, and SLOAN, JJ.

*Edward L Ward,* for the appellant.

*Clarence A. Tucker,* with whom were *Knapp, Tucker & Thomas* on the brief, for the appellees.

URNER, J., delivered the opinion of the Court.

The decree under review on this appeal dismissed a bill of complaint, and dissolved a preliminary injunction, directed against the enforcement of a mortgage securing a loan which the bill alleged to be usurious. The mortgagor was a corporation, which was formed for the purpose of acquiring and mortgaging the property offered as security for the loan. It is contended that the corporate character thus impressed upon the transaction was unreal and deceptive, and was therefore not effective to enable the lender to charge and retain a commission in excess of the legal rate of interest, by virtue of the statutory provision that no corporation shall interpose the defense of usury in any action at law or in equity. Code, art. 23, sec. 131.

The essential facts will be stated as proved by the evidence in the record. On March 2nd, 1927, Samuel G. Rabinowich applied to Louis Eliasberg, who was president of the Finance Company of America and of the Aetna Mortgage Corporation, for a loan to finance the purchase of a furniture business and the lots of ground on which it was conducted. The purchase price was $67,000, on account of which Mr. Rabinowich had paid $5,000, and he desired to borrow $65,000. Mr. Eliasberg declined to make any loan to be secured in part by the personal assets included in the purchase, and he refused also to lend the required amount to Mr. Rabinowich individually, but offered to arrange for loans, aggregating the sum applied for, upon the security of the real estate which the applicant had contracted to buy, and of the other fee simple and leasehold properties already in the joint ownership of himself and his wife, provided that a corporation be formed and invested with title to all of the properties, and that the loans be then made to the corporation and secured by its mortgages to the lenders. This suggestion was acceptable to Mr. Rabinowich, and he authorized the attorney for the lending corporations represented by Mr. Eliasberg to prepare the papers necessary for the creation and organization of the proposed corporate body, under the name of the Broadway Realty Company, as soon as the needed loans were

definitely promised. It was agreed that the Aetna Mortgage Corporation would lend $25,000 to the new company, secured by its first mortgage on part of the real estate to which it would then hold title, and that the Finance Company of America would lend $40,000 to the borrowing corporation, $5,000 of which was to be secured by its first mortgage on property not included in the Aetna corporation's mortgage, and the remaining $35,000 by a second mortgage on all the properties of which it was then the record owner. In addition to six per cent. interest, a commission of six per cent. was agreed to be paid on each of the two first mortgage loans, and a commission of ten per cent. on the second.

The certificate of incorporation of the Broadway Realty Company was executed on March 14th, 1927, and was received, approved, and recorded by the State Tax Commission on the following day. At the same time the incorporation bonus tax and the fee for recording the certificate were paid. The corporation law of the state provides that, when a certificate of incorporation has been delivered to the State Tax Commission with the recording fees, and any bonus tax required to be paid, "the incorporators, their successors and assigns, shall, according to the purposes, conditions and provisions in such certificate of incorporation contained, become and be a body corporate by the name therein stated," and that the "recording by the State Tax Commission of the certificate of incorporation shall be conclusive evidence * * * of the existence of the corporation, except in a direct proceeding by the State." The incorporators of the Broadway Realty Company were Mr. Rabinowich and his wife and son, and they were named in the certificate as directors of the corporation to act until its first annual meeting. The authorized amount of the capital stock was $50,000, divided into 500 shares having each a par value of $100.00. A subscription agreement was signed by Mr. Rabinowich and his wife and son, pledging the first named incorporator to take 400 shares of the stock, and the others 50 shares each, and to pay the par value in cash when payment should be called. The first meeting of the directors was held on March 15th, 1927, Mr.

658

Rabinowich acting as chairman and his son as secretary. The principal action at that meeting, as shown by the minutes, was the adoption of by-laws. On the following day there was a meeting of the directors, at which, according to the minutes, officers were elected and the financial and title arrangements, heretofore outlined, to be fulfilled by the corporation, were reported and approved. Six days later all of the property then owned by Mr. Rabinowich and his wife was conveyed by them to the Broadway Realty Company, the property which he had contracted to buy was conveyed by the vendor direct to the corporation, checks to its order were delivered by the Finance Company of America and the Aetna Mortgage Corporation for the amounts of their respective loans, and were applied to the various purposes, including the payment of the commissions, contemplated by the original agreement, and the debtor corporation thereupon executed the first and second mortgages by which the loans were to be secured.

After the agreement for the loans and incorporation, and before the consummation of the plan, Mr. Rabinowich stated to Mr. Eliasberg that he desired to have the title to the mortgaged properties conveyed to himself and his wife after the transaction had been completed. There being no objection by the lending companies, Mr. Rabinowich had two deeds prepared to accomplish that result. Those deeds were executed immediately after the execution and delivery of the mortgages. One of the deeds reconveyed to Mr. Rabinowich and his wife the lots which they had granted to the Broadway Realty Company, while the other deed conveyed to him alone the lots which had been transferred direct to the company from the vendor with whom he had contracted. In each of the two deeds from the corporation Mr. Rabinowich and his wife, who signed and acknowledged both, expressly assumed the payment of the mortgages to which the granted properties were then subject.

The second mortgage to the Finance Company, which, as stated, was for $35,000, provided for eleven monthly instalments, of $1,000 each, to be paid on account of the principal,

and for the payment of the balance at the end of one year from its date. These requirements were fully performed by Mr. Rabinowich prior to his death, which occurred on August 31st, 1929. He also paid the interest on all of the mortgages while he lived. The pending suit was instituted, after his death, by his widow, who is the residuary legatee and devisee under his will. The Aetna Corporation's mortgage for $25,000 is not involved in this suit, which is directed against the enforcement in full of the $5,000 mortgage of the Finance Company.

While the testimony of the defendant company's representative mentioned other reasons for suggesting and requiring the creation of a corporation to contract and secure the loans applied for, there can be no doubt, upon the evidence in the record, that the primary and decisive consideration was the evidence of a conflict with the usury laws of the state. The question be to determined is whether that purpose was accomplished by the method employed.

The Broadway Realty Company was unquestioably an existing and competent corporation at the time of its execution of the mortgages upon the security of which the lending companies' money was advanced. It was duly created as a body corporate in accordance with the laws of Maryland, and was validly endowed with powers, specified in its charter, to "purchase, lease or otherwise acquire property, real, personal or mixed, and to own, hold, sell and convey, exchange or encumber the same by mortgage, deed of trust, or otherwise and generally deal in, utilize or dispose of such property, real, personal or mixed, and any rights, interests, equities, mortgages or options in, upon or affecting any property." In the partial exercise of those powers the corporation acquired title to property purchased with money loaned upon the faith of the mortgages which it executed in the capacity of a borrower. It received the amounts of the loans and applied them to the objects for which they had been procured. The fact that the equity of redemption in the mortgaged property was immediately thereafter conveyed by the corporation to the plaintiff and her husband could not detract from the

efficiency of the prior corporate acts of acquiring and encumbering the title. In assenting to the subsequent conveyance of the mortgaged property to the original purchaser and owners, the mortgagees apparently acted upon the theory that, after a qualified corporation had validly executed their mortgages, they were not concerned with its further action in regard to the title, as it could convey only subject to their mortgage liens, and as the proposed grantees were to become personally responsible for the mortgage indebtedness. The acceptance of the deeds from the corporation was a recognition of its existence and ability to convey. It was through the corporation that the plaintiff derived the title asserted in this suit, and it was through the participation of herself and her husband, to whose interest she has succeeded, that the corporation was formed. Its creation, to function as a borrower and mortgagor, was an essential condition of the transaction which provided the means for the purchase of property now in the plaintiff's ownership. The margin of security was so slight as to make it impossible to obtain the desired loans at an interest rate legally chargeable to a natural person. Only a corporation would be debarred from pleading usury as against the amount of compensation agreed by the parties to be reasonable for the use of the money and for the risk which the lenders incurred. There was no attempt to disguise the real nature of the charge. The object was to make such a charge lawfully against a corporate borrower capable of legally contracting such a liability.

In *Penrose v. Canton National Bank,* 147 Md. 200, 208, it was said, in the opinion by Chief Judge Bond, that the obvious purpose of the statute preventing corporations from pleading usury "is to leave lenders and corporate borrowers free to agree upon any rate of interest above the regular limit," and in *Carozza v. Federal Finance Co.,* 149 Md. 223, 250, the opinion, by Judge Parke, referring to the same statute, and holding it constitutional, said: "It may well be that the Legislature concluded that a borrowing by a corporation for corporate purposes was distinguished by quite

plain and practical considerations of public policy from a borrowing by an individual for his personal needs * * *".

By joining with her husband and son in the incorporation of the Broadway Realty Company, the plaintiff aided in the creation of a legal body which could make a binding contract with the lenders to pay the required compensation for the loans requested. The lending companies having made the loans to the corporation thus formed, and having relied upon its statutory qualification under its charter to execute the mortgages by which the loans were to be secured, the plaintiff, as one of the incorporators, and as successor in interest of her husband, who negotiated the transaction, is equitably estopped to dispute the validity of the corporation or the conclusive effect of the agreement as to the terms by which the loans to it were induced.

In *Jenkins v. Moyse,* recently decided by the Court of Appeals of New York (254 N. Y. 319), an owner of real estate applied to a broker for a mortgage loan, but was told that "he would have to be incorporated" in order to obtain the loan, as the six per cent. interest chargeable as a maximum rate against an individual borrower would not be satisfactory to a prospective lender on the security offered, while a corporation, under the law of New York, could not plead usury. A corporation was consequently formed by the applicant and invested with the title to his real estate. A mortgage loan, previously negotiated, was then made to the corporation. In addition to interest, a large bonus for the loan was charged. Subsequently the mortgage was foreclosed, and the original applicant for the loan, owning the stock of the corporate mortgagor, sought an adjudication that the loan was in reality made to him personally and was therefore usurious. In reversing a judgment to that effect, the New York Court of Appeals said: "Before any inference can be drawn that the corporate form was used to conceal an unlawful transaction with the plaintiff as an individual, there must be proof at least that there was an individual transaction which the parties might desire to conceal. The plaintiff desired to raise money on mortgage upon his real estate. The defendant

could not lawfully make a loan to the plaintiff individually at a greater rate of interest than six per cent. They never offered or agreed to make the loan to the plaintiff, for the rate of interest which they could lawfully exact from an individual was not attractive to them. The defendants were willing to lend money upon the real estate owned by the plaintiff, provided they could lawfully exact a higher rate of interest. The statute left one way open to accomplish a result desired by both sides. * * * If the property were transferred to a corporation, the corporation could borrow the money upon mortgages given by them without limitation as to the interest it might agree to pay for the loan. So the transaction was consummated, and it was consummated in full compliance with the law of this state. Indirectly through his ownership of the stock of the corporation the plaintiff continued to control the real estate and received substantially the full benefit of the loan. Indirectly, too, the plaintiff suffers loss by the enforcement of the defendants' right to foreclose the mortgage upon the corporate property; but the loan was made to the corporation and was payable only by the corporation and out of property which the corporation had the right to mortgage. Now we are asked to disregard the corporate entity and to declare that a loan made in a form that is legal is merely an evasion of the law, a cloak for a loan made not to the corporation but to the individual who owns its stock. This we may not do. As we have said in *Union Dime Savings Institution of New York v. Wilmot,* 94 N. Y. 221, 227, 46 Am. Rep. 137: 'The parties had a perfect right to deal with each other with the usury laws before their eyes, and to so shape the transaction as to avoid the condemnation of those laws.' As in that case, 'there is no evidence whatever that the transaction took the form it did as a cover for usury. In one sense it took this form for the purpose of escaping usury.' The transaction here had its inception in a loan which the defendants did not make to the plaintiff because it would have been usurious, but which they agreed to make to a corporation which the plaintiff formed because a loan to a corporation is not usurious. The corporation mort-

gage when executed had a valid inception and was free from the taint of usury. It does not become invalid because the corporation was formed as part of a plan whereby the defendants might keep outside of the statute and still obtain a rate from the investment greater than the rates allowed by the statute under other circumstances. *Dunham v. Cudlipp,* 94 N. Y. 129. A corporate entity may be disregarded where it is used as a cloak or cover for fraud or illegality. For that there is ample authority. Here the corporate entity has been created because the statute permits a corporate entity to make a contract which would be illegal if made by an individual. The law has not been evaded but has been followed meticulously in order to accomplish a result which all parties desired and which the law does not forbid." With that reasoning we are in accord.

In the case just cited the corporation held title to the mortgaged real estate until the foreclosure, and it does not appear that the original applicant for the loan guaranteed its payment, while in this instance the title was immediately transferred to the incorporators by whom the properties had been respectively owned or agreed to be purchased prior to the incorporation, and as guarantors they endorsed the notes accompanying two of the mortgages. Those circumstances, however, are not in our judgment sufficient to overcome the considerations to which we have referred as controlling the present decision.

*Decree affirmed with costs.*