SAM D. JOHNSON, Circuit Judge:
This is an appeal from the district court’s affirmance of an order of the bankruptcy court that confirmed a plan for the rehabilitation of a debtor under Chapter XII of the Bankruptcy Act. The debtor in this case is Jules B. LeBlanc, Ill-Corporate Hotel Partnership. The debtor owned and operated the Hilton Hotel at Corporate Square in Baton Rouge, Louisiana, until it filed for relief under Chapter XII in November 1977. Its two secured creditors, Chase Manhattan Mortgage and Realty Trust (Chase) and *874 Louisiana National Bank (LNB), proposed the plan that the bankruptcy court confirmed; they are the appellees in this case. The appellant in this case is Roger J. LeBlanc, an unsecured creditor and a brother of Jules B. LeBlane, III.[1] Roger LeBlanc’s appeal requires this Court to decide four issues: (1) whether the Louisiana usury exception for loans to corporations applies to dummy corporations formed to take advantage of that exception; (2) whether an interest rate of 4 points above prime is “fixed in writing” as required by Louisiana law; (3) whether the plan in this case improperly placed insiders — family members and business associates of general partners of the debtor — in a separate class that received nothing under the plan; (4) whether the bankruptcy court’s evaluation of the debt- or’s hotel was clearly erroneous. We resolve each of these issues against the appellant and affirm.
I. The Facts
In 1973, Jules B. LeBlane, III, and some of his associates began preliminary discussions with Chase about a loan for the construction of a high-rise hotel in Baton Rouge at Corporate Square. Chase agreed to lend $7.6 million for the hotel to a “corporate designee” of Jules B. LeBlane, III, and his associates. On November 20, 1973, Chase loaned $7.6 million to Corporate Hotel, Inc., the corporate designee, and Chase took a first lien on the property where the hotel was to be built. Corporate Hotel, Inc. held record title to this property. Chase advanced funds under the note to pay the costs of constructing the hotel. As the hotel neared completion in 1975, however, Chase’s note went into default. Chase refused to loan any additional funds for the purchase of furniture, fixtures, and hotel equipment. Chase did agree to a “workout,” under which it would refrain from foreclosure, allow a deferral of accrued interest, and reduce interest due in the future on its note. In exchange for Chase’s concessions, the workout obligated Jules B. LeBlanc, III, to obtain from other sources a $1.6 million loan to furnish the hotel and a $2.25 additional equity contribution to complete construction of the hotel. LNB loaned the $1.6 million needed to furnish the hotel. In return, it took a first lien on the hotel furnishings and equipment and a lien second to Chase’s on the hotel itself. LNB also loaned $2.25 million to Sally LeBlanc Brinkley through several intermediaries to finance her purchase of a 41% equity interest in the hotel venture. Finally, as part of this workout, Corporate Hotel, Inc. transferred title to the hotel to the debtor in this case, Jules B. LeBlane, Ill-Corporate Hotel Partnership. The debtor is a partnership in commendam, the Louisiana form of a limited partnership. Jules B. LeBlane, III, is the general partner of the debtor holding a 70 percent interest in the debtor.
With this influx of new money, the debt- or completed the hotel and opened for business in the spring of 1976. Business went poorly, however, and the debtor defaulted again on its interest payments to Chase. On November 8, 1977 the debtor filed for relief under Chapter XII. The case was transferred to New Orleans because the Baton Rouge bankruptcy judge was a director of LNB. The debtor’s main asset was, of course, the hotel. The debtor also had a small amount of cash on hand plus some accounts receivable. Chase and LNB' were the only secured creditors, and there were a number of unsecured creditors. In January 1978, Chase and LNB jointly filed a proposed plan. They conditioned the plan on a finding by the bankruptcy court that *875 the debtor’s property was worth less than their liens on it. The court found that the hotel and its furnishings were worth $10 million, and that the debtor had $260,000 cash. The court set the value of Chase’s claim against the debtor at $8.72 million and LNB’s claim against the debtor at $1.79 million. The bankruptcy court held that interest was to accrue on these claims until their release. Thus, the value of the combined claims of Chase and LNB, $10.5 million, exceeded the value of the debtor’s property, $10.26 million, and the condition on Chase and LNB’s proposed plan was met.
The plan provided for a new corporation, 100% owned by Chase, to take title to, operate, and eventually sell the hotel. The plan also provided for the execution of a note for $11.95 million in favor of Chase and LNB. When the new corporation eventually sold the hotel, the plan provided for Chase to take 82 percent of the sale proceeds and LNB 18 percent.
The plan obligated Chase to provide up to $300,000 of its own money to meet the payments specified in the plan.[2] The plan provided for full payment of all priority and administrative expense claims and varying payments to the different classes of unsecured creditors. Small trade creditors holding the claims of $200 or less were to be paid in full; other trade creditors holding claims greater than $200 were to be paid 40% of their claims; and unsecured creditors who were also insiders of the debtor were to be paid nothing under the plan. Insiders included partners in the debtor, anyone in the immediate family of a partner of the debtor, and any entity owned or controlled by anyone otherwise defined as an insider. Under the plan, Roger J. LeBlanc — an insider — would receive nothing on his $100,000 unsecured claim against debtor.
All of the smaller trade creditors and 98% of the larger trade creditors voted to accept the plan. The insiders, who took nothing under the plan, voted not to accept the plan. The bankruptcy court confirmed the plan on March 15, 1978. Under the plan, Chase and LNB have paid out $120,000 to the trustees, $10,000 to other administrative expense claimants, and $398,000 to the unsecured trade creditors. How much of this $528,000 paid out under the plan was advanced by Chase and LNB is not clear because the operation of the hotel may have generated revenues between the time that the plan was confirmed and the time that creditors were actually paid. Roger J. LeBlanc appealed the bankruptcy court’s order confirming the plan to the district court. The appellant stayed execution of the plan by posting a supersedeas bond. The district court affirmed the confirmation order and this appeal followed. Pending resolution of this appeal, the parties agreed to a limited stay of execution of the plan. The limited stay allows the Chase subsidiary to operate but not to sell the hotel.
II. The Louisiana Corporate Usury Exception
The appellant’s primary point on appeal is that the bankruptcy court erred in not reducing the amount of Chase’s claim against the debtor for allegedly usurious interest. The Chase note for $7.6 million to Corporate Hotel, Inc. set the interest at four points above the prime rate charged by the Chase Manhattan Bank in New York. Of the $8.72 million claim allowed to Chase by the bankruptcy court, $2.04 million was accrued interest. Chase has stipulated that a substantial part of the interest included within its claim accrued at a rate greater than 10 percent. At all times relevant to this case, Title 9, Section 3503 of the Louisiana Statutes provided that interest on loans secured by a mortgage on immovable property shall not exceed 10 percent.[3] Title 9, *876 Section 3501 of the Louisiana Statutes provides for the forfeiture of the entire interest in any note that charges a rate in excess of the lawful maximum.[4] Chase has stipulated that a large proportion of the over $2 million interest included in its claim was accrued at a rate in excess of ten percent. Chase claims that its loan was not usurious because it falls within the Louisiana corporate usury exception, which allows corporations to agree to any rate of interest and which prohibits a corporation from asserting a usury defense.[5]
Appellant claims that the corporate usury exception does not apply to Chase because Chase made its loan to a dummy corporation formed solely for the purpose of circumventing the usury laws of Louisiana. Appellant cites no Louisiana authority for this proposition. Instead, he relies on cases from other jurisdictions. Chase has responded with a three point attack to defeat appellant’s attempt to avoid the corporate usury exception. First, Chase claims that Corporate Hotel, Inc. was not a dummy corporation formed merely to circumvent the usury laws of Louisiana. Second, Chase claims that the jurisdictions in this country are split on whether a debtor can form a dummy corporation to evade the usury laws, and that the Louisiana courts would follow the “better rule,” which allows eva *877 sion. Third, Chase claims that no state has ever voided a corporate usury exception on facts similar to those in the instant case. We assume, without deciding, that Corporate Hotel, Inc. was a dummy corporation formed so Chase could charge interest over ten percent. We hold that the Louisiana courts would apply the corporate usury exception given the facts of this case, and we affirm the bankruptcy court’s allowance of interest as part of Chase’s claim.[6]
The key fact in determining whether the Louisiana courts would hold the usury exception inapplicable to the loan from Chase to Corporate Hotel, Inc. is that Chase loaned almost $8 million for a business purpose to a profit making enterprise. As the New York Court of Appeals stated in Schneider v. Phelps, 41 N.Y.2d 238, 391 N.Y.S.2d 568, 571, 359 N.E.2d 1361, 1365, “There is no difficulty in sanctioning the use of a shell corporation to avoid the usury laws provided that the true borrower has a business purpose and the corporation itself is a financing device in furtherance of the profit oriented enterprise.” The court went on to distinguish between a shell corporation formed to secure a loan for the profit making purposes of a business and a shell corporation formed to secure a loan for the personal obligations of an individual. The court held that it would recognize the corporate usury exception only for a shell corporation formed to secure a loan for a business purpose. It also held that the corporate usury exception would not apply to a shell corporation formed “to strip from an impoverished debtor the benefits of the usury laws.” 391 N.Y.S.2d at 571, 359 N.E.2d at 1365. In the instant case, there is no question that Corporate Hotel, Inc., was formed to secure a loan for a business purpose of a profit making enterprise.
The Arizona courts have followed New York in holding that a usury defense is not available to a corporate shell formed to borrow money for a business purpose. See Gangadean v. Flori Investment Co., 11 Ariz.App. 512, 466 P.2d 63 (1970). In that case, the plaintiff sued to recover on a note made by a corporation that was incorporated two days before the loan was made. The individual defendants in the action, a husband and wife, had guaranteed the note. The trial court found that the loan was made for the business purpose of marketing a beauty oil product and held that the individual defendants could not accept a usury defense. The appellate court affirmed. Fifty years ago, the Court of Appeals of Maryland held that a loan to a dummy corporation formed to finance the acquisition of furniture business was within the corporate usury exception. In Rabinowich v. Eliasberg, 159 Md. 655, 152 A. 437 (1930), the lender agreed to loan $65,000 to finance the acquisition of a furniture business provided Rabinowich formed a corporation to take title to the property of the furniture business and to mortgage that property to the lender. Again, this case illustrates that a lender can require a borrower to form a corporation to circumvent or lessen the impact of usury laws as long as the loan is made for a business purpose. See also American Century Mortgage Investors v. Regional Center, Ltd., 529 S.W.2d 578 (Tex. Civ.App. — Dallas 1975) (reversing the grant of a temporary injunction enjoining foreclosure of a loan at four and one half percent over prime where the lender required borrower to form a corporation so it could demand a higher rate of interest.)
The cases that appellant cites for the proposition that a dummy corporation cannot be formed to circumvent the usury laws generally involve loans made to shell corporations formed to acquire a loan for the personal obligations of the individual guarantor of the loan. In Havens v. Woodfill, 266 N.E.2d 221 (Ind.App.1971), the lender required the borrowers, a husband and wife, to form a partnership to circumvent the Indiana usury statute. The lender made three separate loans of $100 to the borrow *878 ers. The concurring opinion in the case stressed that there was no evidence that the husband and wife were engaged in any business enterprise. 266 N.E.2d at 227. In Walnut Discount Co. v. Weiss, 205 Pa.Super. 161, 208 A.2d 26, 28 (1965), the court stated that a Pennsylvania corporate usury exception does not “extend its effect to loans to individuals who, though on the face of the documents [are] endorsers or guarantors of a corporate obligation, are in fact the real debtors.” The appellant here seeks to use this broad language to support a favorable result in this case. The facts of the two cases, however, are not similar at all. In Walnut Discount, the borrowers were two parents who guaranteed a $2900 obligation of a successor corporation to a bankrupt corporation of which their son had been president. See also Lesser v. Strubbe, 67 N.J.Super. 537, 171 A.2d 114, 116 (Super.Ct. at Div.1961) (allowing the assertion of a usury defense in a loan to a corporation when the trial court found the loan was actually made to an individual through the guise of a corporation and the lender knew all along that the loan proceeds were to be used for the personal purposes of the borrower.)
The Florida courts will not recognize the corporate usury defense when the trial court finds that a loan was in fact made to an individual and that the corporation was formed as a device to evade the- usury laws. See Tel Service Co. v. General Capital Corp., 227 So.2d 667, 670 (Fla.1969). The mere fact, however, that a lender insists that a borrower form a corporation so that it can charge a higher rate of interest is not sufficient to establish that the loan is made to an individual. Id.
Thus, the great weight of authority does not allow the assertion of a corporate usury defense in loans to dummy corporations formed to charge a higher rate of interest than could be charged an individual when the loan is made for a business purpose. Assuming without deciding, as we have, that those are the facts in this case, we conclude that Louisiana would follow the weight of authority in interpreting its corporate usury exception. Recent amendments to the corporate usury exception by the Louisiana Legislature buttress this conclusion. As discussed above,[7] the Legislature has extended the usury exception to include loans to partnerships in commendam, like the debtor in the instant case. The Legislature has also provided that individual guarantors of a corporate or a partnership debt cannot assert the usury defense. These two developments make it very unlikely that a Louisiana court would allow the assertion of the usury defense on the facts of this case. We hold the Chase loan to Corporate Hotel, Inc. was within the Louisiana corporate usury exception.
III. Is an Interest Rate of Four Points Above Prime “Fixed in Writing” as Required by Louisiana Law?
As quoted above, Louisiana law requires the interest rate on an obligation secured by a mortgage on immovable property to be “fixed in writing; testimonial proof of it is not admitted in any case.” La.Rev.Stat.Ann. Tit. 9, § 3503 (West). Appellant claims that the interest due Chase, which was set at four percentage points above prime, was not fixed in writing. This Court does not agree with appellant’s contention. The requirement that an interest rate be fixed in writing is akin to a parol evidence rule. See Katz v. Krauss Company Employees Pension Fund, 161 So.2d 389 (La.Ct.App.1964) (referring to the same language in La.Civ.Code Ann. art. 2924 (West) as a parol evidence rule). A rate of four points above prime is fixed in writing within the meaning of the Louisiana statutes and the Louisiana civil code. There is no danger of a swearing match over what the parties meant by four points above prime. Thus, holding that such an interest rate is not fixed in writing would not serve the purposes of the parol evidence rule. Furthermore, variable interest rates keyed to the prime rate are commonplace in business loans. This Court in the absence of any case authority or logical reason, will not *879 torture the words of a statute to invalidate thousands or perhaps tens of thousands of loans.
IV. Did the Plan Improperly Place Insiders in a Separate Class That Received Nothing?
Appellant claims that the plan proposed by Chase and LNB and confirmed by the bankruptcy court arbitrarily and discriminatorily placed insiders with unsecured claims against the debtor in a separate class that received nothing under the plan. The other unsecured creditors in this case were trade creditors. The plan provided for full payment to unsecured creditors with claims of $200 or less and for payment of 40% of unsecured trade creditors’ claims of greater than $200. As a general rule, the classification in a plan should not do substantial violence to any claimant’s interest. The plan should not arbitrarily classify or discriminate against creditors. Anderson & Ziegler, Real Property Arrangements Under the Old and New Bankruptcy Acts, 25 Loy.L.Rev. 713, 717-18 (1979). See also In re Jaco Fabrics, Inc., 15 Collier Bankruptcy Cases 459 (M.D.Ga.1978) (denying confirmation and stating that the debtor cannot pick and choose who will be affected by a plan except by reasonable classifications). The fact that bankruptcy courts are courts of equity, however, allows exceptions to any strict rules of classification of claims. A bankruptcy court can permit discrimination when the facts of the case justify it. Comment, Classification of Claims in Debtor Proceedings, 49 Yale L.J. 881, 882-85 (1940). Here, the facts of the case compel this Court to affirm the bankruptcy court’s confirmation of the plan that separately classified trade creditors and insiders.
First, there was no equity in the debtor’s property for distribution to unsecured creditors. The insiders who took nothing under the plan would have taken nothing in liquidation. See In re Hamburger, 117 F.2d 932 (6th Cir. 1941) (holding that unsecured creditors have no place in Chapter XII proceedings unless equity remains after payment of secured claims).
Second, appellant is the only creditor who has objected to the plan’s classification scheme.[8] The great majority of insiders did not object to the plan’s classification scheme. Similarly, in In re Palisades-on-the-Desplaines, 89 F.2d 214 (7th Cir. 1937) the court rejected the appellant’s claim that the plan was inequitable and discriminatory in its classification scheme. The court relied on the finding of the court below that the plan was equitable and the fact that a large majority of creditors approved the plan.
Third, it is far from clear that the classification scheme in this case was arbitrary and discriminatory. Trade creditors with unsecured claims did receive better treatment than insiders with unsecured claims, but that fact alone does not establish arbitrary or discriminatory classification. The trade creditors advanced goods and services to the debtor in the ordinary course of business, frequently without any knowledge of the debtor’s financially perilous condition and without any real opportunity to protect themselves. Furthermore, the proponents of the plan who were to operate the hotel under the plan may well have needed to maintain good relations with trade creditors upon whom they would have to rely to furnish additional goods and services to the hotel. In contrast, the insiders made loans to the debtor when they were in a position to know of the debtor’s financial condition and the risks involved with those loans. Also, the insiders were not going to have any ongoing relationship with the hotel after confirmation of the plan.
The facts of this case compel this Court to reject appellant’s contention that the bankruptcy court should not have confirmed the plan because of its classification scheme.[9]
*880 V. Was the Bankruptcy Court’s Evaluation of the Debtor’s Hotel Clearly Erroneous?
The bankruptcy judge found that the hotel property was worth $10 million after hearing testimony from appraisers offered by Chase and from appraisers offered by the appellant. All the appraisers used the same method to calculate the value of the hotel. They determined what annual income the hotel could produce and what capitalization rate to use to convert that annual income figure into an estimate of value. Chase’s appraisers testified that the hotel was worth $9.9 million, based on an estimated annual income of $1 million and a capitalization rate of 10.167 percent. Appellant’s appraisers testified the hotel was worth $11 million, based on an estimate of $1.27 million annual income and a capitalization rate of 11.55 percent. Chase’s appraisers were from the Baton Rouge area, but they had no experience in appraising highrise hotels like the Hilton. Appellant’s appraisers were not from the Baton Route area, but they had experience in estimating the value of hotels like the Hilton.
We review the bankruptcy court’s determination of the hotel value under the clearly erroneous standard. Rule 810, Rules of Bankruptcy Procedure. We cannot say that the bankruptcy judge was clearly erroneous in setting the value of the hotel at $10 million. The bankruptcy court picked a figure between the two figures offered by the opposing appraisers. Both estimates of the appraisers appear reasonable and are fairly close to each other. The Chase appraisers thought the hotel was less risky than did the appellant’s appraisers. This is indicated by the lower capitalization rate used by the Chase appraisers. At the same time, however, the Chase appraisers thought the hotel would produce less income than the appellant’s appraisers thought it would produce. Thus, the Chase appraisers took an entirely consistent approach to estimating the hotel’s value. The fact that the Chase appraisers had no experience in appraising highrise hotels like the Hilton does not make the bankruptcy court’s reliance on the Chase appraisers clearly erroneous. The Chase appraisers used the same method as did the appellant’s appraisers, and the Chase appraisers were more familiar with local conditions. The bankruptcy court’s determination that the debtor’s hotel was worth $10 million is affirmed.
AFFIRMED.

. Sally LeBlane Brinkley, sister of Roger J. LeBlanc, has also appealed from the confirmation of the plan proposed by Chase and LNB. We dismiss her appeal on our own motion because she is not a creditor of the debtor. Ms. Brinkley filed a proof of claim in the bankruptcy proceedings asserting that she had advanced $2.25 million to the debtor and that the debtor owed her this amount as an unsecured claim. The bankruptcy disallowed Ms. Brinkley’s claim, holding that she had purchased a 41% equity interest in the debtor, and that she had not made an unsecured loan to the debtor. Ms. Brinkley did not appeal the bankruptcy court’s disallowance of her claim to the district court or to this Court. The bankruptcy court’s disallowance, therefore, is a final judgment. Ms. Brinkley is not a creditor; she has no interest in this appeal.

. At oral argument before this Court, Chase’s counsel candidly explained that Chase agreed to advance $300,000 under its proposed plan to cut its losses. Chase apparently believed that it would more than make up the $300,000 if its proposed plan was promptly confirmed and its subsidiary, instead of the trustees appointed by the bankruptcy court, could operate the hotel.

. La.Rev.Stat.Ann. tit. 9, § 3503 (West) provided as follows:
*876 Notwithstanding any other law to the contrary, particularly but not exclusively Revised Civil Code Article 2924, the amount of simple conventional interest on obligations bearing interest from date and secured in whole or in part, directly or indirectly, by a mortgage on immovable property, shall not exceed 10% per annum. The same must be fixed in writing; testimonial proof of it is not admitted in any case.

. La.Rev.Stat.Ann. § 9: 3501 (West) provides that:
Any contract for the payment of interest in excess of that authorized by law shall result in the forfeiture of the entire interest so contracted.

. The parties concede that La.Rev.Stat.Ann. Tit. 12, § 703 (West 1969) controls this case. That section reads as follows:
§ 703. Rate of interest paid by corporations
Notwithstanding any other provision of the laws of this state to the contrary, any domestic or foreign corporation organized for profit may agree to pay any rate of interest in excess of the maximum rate of conventional interest authorized by law, and as to any such agreement, the claim or defense of usury, or of the taking of interest in excess of the maximum rate of conventional interest, by such corporation, is prohibited.
Added by Acts 1965, No. 15, § 1. Renumbered from R.S.1950, § 12:603 by Acts 1968, No. 105, § 3, eff. Jan. 1, 1969.
The Louisiana Legislature has since amended La.Rev.Stat.Ann. Tit. 12, § 703 to broaden the corporate usury exception to apply to partnerships in commendam. The Legislature has also acted to overrule the decisions holding that individuals guarantors of a note made by a corporation can assert a usury defense to enforcement of that note. See Rosenthal & Rosenthal, Inc. v. Huma Townhouse Apartments, La.App., 238 So.2d 9 (1970); Meadowbrook National Bank v. Recile, 302 F.Supp. 62 (E.D. La.1969). La.Rev.Stat.Ann. Tit. 12, § 703 (West 1980) now reads as follows:
§ 703. Rate of interest paid by corporations
Notwithstanding any other provisions of the law of this state to the contrary, any debtor that is a domestic corporation, a foreign corporation, a partnership in commendam formed pursuant to the laws of this state, a foreign limited partnership, or a partnership all of the partners of which are either corporations, foreign limited partnerships, partnerships in commendam or partnerships comprised of corporations, foreign limited partnerships or partnerships in commendam, may agree to pay interest in excess of the maximum rate of conventional interest authorized by the laws of this state, whether in connection with unsecured or secured indebtedness and whether the secured indebtedness is secured, in whole or in part, directly or indirectly, by a real estate mortgage or chattel mortgage on property in this state or is otherwise secured, and as to any such agreement such debtor corporation or partnership shall be prohibited from asserting a claim or defense of usury or of the taking of interest in excess of the maximum rate of conventional interest, and any person, partnership or corporation whatsoever signing as co-maker, guarantor or endorser for such debtor corporation or partnership shall also be prohibited from asserting any such claim or defense. The term foreign limited partnership as used hereinabove shall mean any partnership domiciled in a state of the United States other than Louisiana or the District of Columbia which shall have been formed and is existing pursuant to the limited partnership law or Uniform Limited Partnership Law of any such state, and such partnership need not qualify as a partnership in commendam under the laws of this state.
Amended by Acts 1969, No. 31, § 1; Acts 1970, No. 437, § 1; Acts 1977, No. 210, § 1.

. Appellant has moved this Court to certify the question whether Louisiana would apply the corporate usury exception in this case to the Louisiana Supreme Court. Finding no authority and having been presented with none for the inapplicability of the corporate usury exception given the facts of this case, we decline to delay resolution of this case further by certification.

. See note 5, supra.

. Sally LeBlanc Brinkley also objected to the plan’s classification scheme, but she is not a creditor.

. Appellant also argues that the classification scheme in this case worked as an equitable *880 subordination of insiders’ claims outside the requirements of Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692 (5th Cir. 1977). Subordination deals with distribution of the debtor’s assets. In this case, payments under the plan were made from moneys advanced by the proponents of the plan. There were no assets of the estate available for distribution to unsecured creditors. We view the doctrine of equitable subordination and its requirements as inapplicable here.