505 A.2d 140

Jeffrey A. LEVITT, et ux.

v.

STATE OF MARYLAND DEPOSIT INSURANCE FUND CORPORATION, Conservator et al.

Jeffrey A. LEVITT and Karol Levitt

v.

STATE of Maryland.

Nos. 1085, 1416, Sept. Term, 1985.

Court of Special Appeals of Maryland.

March 5, 1986.

Paul Mark Sandler (Bryan D. Bolton, Freishtat & Sandler, Baltimore, William G. Hundley and Hundley & Cacheris, P.C. on brief, Washington, D.C.), for appellants.

Peter H. Gunst (Shale D. Stiller, Allen L. Schwait, Evelyn W. Pasquier, Deborah L. Robinson, Frank, Bernstein, Conaway & Goldman, Stephen H. Sachs, Atty. Gen., Charles O. Monk, II, Deputy Atty. Gen. and Deborah K. Chasanow, Asst. Atty. Gen. on brief), Baltimore, for appellee.

Argued Before GILBERT, C.J., and ALPERT, and ROSALYN B. BELL, JJ.

GILBERT, Chief Judge.

Jeffrey A. and Karol Levitt have appealed to this Court from two separate but related orders of the Circuit Court for Baltimore City. The first case challenges the authority of the circuit court to issue a prejudgment injunction that conditionally impounds the Levitts' property. The second

case attacks a contempt judgment against the Levitts for disobeying the injunction. Because our decision in the first case, in part, controls the second case, we *nostra sponte* consolidated the appeals.

### Case No. 1

The narrow issues before us are:

   I.  Did the circuit court have "jurisdiction to seize the Levitts' assets and limit their personal expenses"?

  II.  Did the Levitts violate the consent order when, in response to discovery, they asserted their privilege against self-incrimination?

III.  Was the court empowered to overrule the Levitts' objection and modify the consent order of August 5, 1985?

Before endeavoring to answer the issues posed to us by the Levitts, we recount briefly the facts leading to this appeal.

The *Sturm und Drang*[1] that befell the depositors of Old Court Savings and Loan Association (Old Court) prompted the Circuit Court (Kaplan, J.) to appoint a conservator for Old Court. The Maryland Savings-Share Insurance Corporation (MSSIC) was originally appointed as conservator, but as a result of legislation enacted on May 18, 1985, at a special session of the Maryland General Assembly, MSSIC was absorbed by Maryland Deposit Insurance Fund Corporation (MDIF).

In the Circuit Court for Baltimore City, MDIF sued the Levitts and a number of other persons, partnerships, and legal entities.[2] The suit alleged, in pertinent part, that Jeffrey A. Levitt had "fraudulently misappropriated funds from Old Court and its subsidiaries and affiliates"; directed

---

**1.** "Storm and Stress"—the title of a play written in 1776 by Friedrich Maximillian Von Klinger (1752–1831).

**2.** The principal players in this financial melodrama are many, but only the Levitts are on stage in this segment.

the making of a "profit entry" in Old Court's books, which was "false and fraudulent"; and fraudulently manipulated funds of Old Court.

Additionally, the complaint charged that the actions of Jeffrey and Karol Levitt and others

> "constituted fraud on Old Court. The fraudulent actions of these Defendants included nondisclosure, where there was a duty to disclose, misrepresentation of existing material facts, and the acceptance of fees for services not performed or excessive fees for services. Additionally, [Jeffrey A.] *Levitt's* fraudulent actions included the false inflation of property values and the fraudulent creation of appearances of equitable interests in property where none existed. At the time of these fraudulent actions, the Defendants were aware that said actions were fraudulent and that Old Court would rely on said actions; and Old Court reasonably relied on these actions to its subsequent detriment. The actions, statements and intentional non-disclosures of Defendants to Old Court were made with the intent to deceive Old Court. Moreover, at the time of said actions, Old Court was controlled and dominated by directors and officers who participated in these fraudulent actions; and, therefore, Old Court was unable to take appropriate corrective action to prevent such fraudulent actions. As a proximate result of said fraudulent actions, Old Court has sustained compensatory damages in a substantial amount...."

MDIF's complaint, while grounded in law, sought equitable relief. It asked, among other things, for an accounting, imposition of a constructive trust or an equitable lien, and restitution. Furthermore, MDIF requested the circuit court to issue an interlocutory injunction to prevent the Levitts from dissipating assets "pending ... [a] decision on the merits...."

The Levitts opposed the injunction, asserting that the court lacked jurisdiction to provide that relief. Subsequent-

ly, a "consent order" [3] was entered into between the parties. That order, dated August 5, 1985, provided, in pertinent part:

"During the pendency of this litigation, Defendants, ... and each of them, [with] their consent are enjoined from removing, transferring, alienating, pledging, or otherwise impairing any assets in which Defendants have any direct or indirect interest, ... except upon application in writing to Plaintiff and the Court ... [,] provided, however, Defendants may transfer assets without notice to Plaintiff or the Court as follows:

1.  Each individual Defendant may transfer assets for ordinary and necessary personal living expenses not to exceed the level of expenses required to maintain Defendant's standard of living as of May 13, 1985;

2.  Each Defendant may transfer assets in the ordinary course of business and to meet ordinary and necessary business expenses; and

3.  Each defendant may use his, her, or its assets to compensate attorneys for legal expenses at their normal hourly rates, plus disbursements.

In the event any Defendant wishes to make transfers other than transfers authorized by paragraphs 1 through 3 above, such Defendant shall give prior notice in writing of such proposed transfer to Plaintiff and the Court. Plaintiff shall respond in writing to Defendant and to the Court promptly upon receipt of Defendant's notice. If Plaintiff does not oppose the proposed transfer, the transfer may be made without further Order of this Court. If Plaintiff opposes the proposed transfer, the Court shall promptly schedule a hearing to rule upon the matter."

The trial judge explained in open court immediately preceding the signing of the consent order:

---

**3.** On oral argument counsel for the Levitts seemed to suggest that the "consent" was more coerced than voluntary—a "shot-gun consent." Despite the apparent suggestion, the validity of the consent was not challenged and we do not consider it.

"I will allow ... [MDIF] to make in discovery, and ... [the Levitts] will be required to answer in discovery, inquiries concerning the standard of living and what expenses they have paid or what transfers they have made of their assets and property, and so you will have that ability, and if they except to a question on interrogatories, object to a question on interrogatories because you are inquiring into their transfers or inquiring into their standard of living, then I will overrule that objection, and the same thing holds true—I'm not going to get into the criminal matters now, but if a question legitimately inquires into what transfers they have made since the signing of the order and basically what they have spent money on since the signing of the order, they will answer the question."

When interrogatories and request for production of documents were served upon the Levitts, they declined to answer on the bases of a lack of relevancy, hardship, and Fifth Amendment provisions against self-incrimination.[4]

The Levitts' declination to answer discovery questions caused MDIF to seek a modification of the August 5, 1985, consent order. The conservator proposed that the Levitts be "restrained from expending in excess of $1,000 per week, exclusive of reasonable attorney's fees and disbursements, for their personal living expenses." Not surprisingly, the Levitts resisted the proposed amendment. Judge Kaplan, however, granted MDIF's motion. He directed:

"Jeffrey A. Levitt and Karol Levitt ... are restrained from expending in excess of $1,000 per week, exclusive of educational expenses (i.e., tuition, room, board, books and laboratory fees) for their two sons and reasonable attorneys' fees and disbursements, the limitation of $1,000 per

---

**4.** The Levitts knew that the attorney general was conducting a probe into possible criminal charges against Jeffrey Levitt. That possibility subsequently became a reality when Mr. Levitt was indicted by the Grand Jury for Baltimore City on multiple counts.

week being applicable on a combined basis and not for each individual Defendant...."

Counsel for the Levitts contended that the court "should grant four thousand dollars a week for expenses because that would include what has to be provided for." In response, Judge Kaplan said:

"I told you yesterday [and] I tell you again today ... that ... until Mr. Levitt through you presents me with a list of their fixed monthly expenses, which they're obligated to pay in order to survive without foreclosures or without food and utilities I will leave my order in the form that I have dictated it into the record. When you can establish to me that there is some error in the amount set forth in that order because of his need, his fixed needs, I will consider it as a motion to modify the limitation of that order."

This appeal ensued.

## I

### The Jurisdictional Issue

■ The Levitts aver that the circuit court was without jurisdiction to issue the injunction, notwithstanding their consent. They ground their argument on four cases: *Kinsey v. Drury*, 141 Md. 684, 689–690, 119 A. 646, 648–649 (1922); *Frederick County Nat'l Bank v. Shafer*, 87 Md. 54, 59, 39 A. 320, 321 (1898); *Balls v. Balls*, 69 Md. 388, 389, 16 A. 18, 19 (1888); *Morton v. Grafflin*, 68 Md. 545, 562, 13 A. 341, 346, *motion overruled*, 68 Md. 567, 15 A. 298 (1888), and on Maryland Courts and Judicial Proceedings Code Ann. § 3–301 *et. seq.*

In each of the above cases, a creditor endeavored to secure a prejudgment injunction to prevent an alleged debtor's disposition of property pending civil litigation. The Court of Appeals turned aside the creditor's attempts.

The Levitts assert that under the holdings of the quartet of *Kinsey, Frederick County Nat'l Bank, Balls,* and *Morton,* MDIF's exclusive remedy was statutory. The position

of the Levitts is that unless a statute specifically permits an attachment on original process—a prejudgment attachment—a court lacks authority to impound assets.

The statute that sanctions prejudgment attachments is found in Maryland Courts & Judicial Proceedings Code Ann. § 3–303. There it is provided:

"An attachment before judgment may issue in any of the instances in this section.

(b) If the debtor is a nonresident individual, or a corporation which has no resident agent in this State, and:

(1) The debtor is a person over whom the court could exercise personal jurisdiction pursuant to §§ 6–102, 6–103 and 6–104 of this article; or

(2) The action involves claims to property in this State which property is to be attached; or

(3) The action is any other in which the attachment is constitutionally permitted.

(c) If a resident individual defendant or an agent authorized to accept process for a corporation has acted to evade service.

(d) If the debtor has absconded or is about to abscond from the State; or if an individual has removed, or is about to remove, from his place of abode in the State with intent to defraud his creditors.

(e)(1) If the debtor is about to assign, dispose of, conceal, or remove his property or a portion of it from the State with intent to defraud his creditors; or

(2) If the debtor has done any of these acts, fraudulently contracted the debt or incurred the obligation which is subject of the pending action.

(f) If the debtor is deceased and an adult nonresident is entitled by descent or devise from the debtor to any land or interest in land in the State, an attachment may issue against that land or interest held by descent or devise from the person indebted.

(g) If any person who is required to be but is not licensed and bonded under the provisions of Article 56,

§ 257 of the Code, in an action against that person arising out of a home improvement transaction."

The only one of the five instances of permitted prejudgment attachments that arguably applies to the instant case is subsection 3–303(e). That subsection, however, is governed by Cts. & Jud.Proc.Art. § 3–304(b), which mandates that an attachment for fraud, § 3–303(e) "may issue only in an action based on contract for liquidated damages." The allegations in MDIF's complaint are a mixture of tort and contract; in any event, the damages are unliquidated and the statute does not, therefore, apply.

Because the relief sought by MDIF does not fit within any of the five statutorily authorized prejudgment attachments, the Levitts maintain that the trial court was without jurisdiction to issue the injunction. Furthermore, the Levitts argue that it is immaterial that they consented to the injunction of August 5, 1985, since it is axiomatic that parties may not by consent confer subject matter jurisdiction upon a court. *Attorney Griev. Comm'n. v. Hyatt*, 302 Md. 683, 690, 490 A.2d 1224, 1227 (1985); *Kawamura v. State*, 299 Md. 276, 282, 473 A.2d 438, 441 (1984); *Anthony Plumbing of Md. v. Atty. Gen.*, 298 Md. 11, 15–16, 467 A.2d 504, 506 (1983); *Highfield Water Co. v. Wash. Co. San.*, 295 Md. 410, 414, 456 A.2d 371, 373 (1983); *Smuck v. Anne Arundel County*, 55 Md.App. 163, 166, 461 A.2d 42, 43 (1983). Their consent to the order of the circuit court is meaningless, the Levitts declare, and the entire proceeding in the trial court was and is a nullity.

We turn now to the foundation upon which the Levitts have built their argument. *Balls* and *Morton* appear to support their position. In the *Balls* case, the Court said:

"Except where changed by statute, it is an invariable rule that the holder of a debt cognizable at law cannot obtain relief in equity, until he has shown that his legal remedies are inadequate. If he seeks to subject real estate to the payment of his debt, he must obtain a judgment creating a lien upon it; if he is pursuing person-

al estate, he must obtain a lien by an execution on his judgment. When he has by these means acquired an interest in his debtor's property, he will be in a condition to ask the aid of a Court of Equity; if, in other respects, he can show a case within its jurisdiction. *Wiggins v. Armstrong*, 2 John.Ch. 144; *Brinkerhoff v. Brown*, 4 John.Ch. 671; *Birely v. Staley*, 5 G. & J. 432; *Griffith v. Bank*, 6 G. & J. 424. The Act of 1835, ch. 380, sec. 2, dispensed with the necessity of a judgment in all cases of proceedings in equity 'to vacate any conveyance or contract or other act as fraudulent against creditors.' This Act clearly has no application where the thing complained of has not been executed, but rests merely in contemplation or intention."

69 Md. at 389, 16 A. at 19.

The *Morton* Court declared that before a creditor has standing in an equity court, he must first obtain a judgment against the debtor. An exception, however, is permitted by *Morton* in those particular instances where a debtor has "fraudulently conveyed away" property. *Morton*, 68 Md. at 562, 13 A. at 346. The key words, "fraudulently conveyed," we observe, are in the past tense, and *Morton* makes clear that the fraudulent conveyance must have previously transpired and not simply be contemplated, expected or anticipated by the creditor. In short, the conveyance must be a *fait accompli* and not merely a notion.

We do not read *Kinsey* and *Frederick County Nat'l. Bank* to be entirely supportive of the Levitts' position. Those two cases appear to have narrowed the broad holdings of *Balls* and *Morton*. *Kinsey* comments that there was nothing "to be found in the record [of that case] to support the charge of fraud" and that *"[a] mere charge of fraud unsupported by the facts upon which it is based sufficient to justify the inference is entitled to no consideration in a case such as this."* 141 Md. at 691, 119 A. at 649 (emphasis supplied). *Frederick County Nat'l. Bank*

contains the observation that, "[T]he claim of the plaintiff is purely a legal one, and it is simply a general creditor without a judgment to establish the indebtedness of the defendant or the amount due. *There is no suggestion of fraud on the part of the defendants, or any of them."* 87 Md. at 55, 39 A. at 320 (emphasis supplied).

As we have previously observed, the complaint in the instant case was brought at law, but MDIF sought equitable relief. Indubitably, law courts are empowered to issue injunctions and require accountings.[5]

Historically, courts of equity have enjoined fraud, provided the charge is supported by sufficient facts. *Harper v. Clayton,* 84 Md. 346, 35 A. 1083 (1896); *Barron v. Whiteside,* 89 Md. 448, 457–458, 43 A. 825, 826 (1899); *Conner v. Groh,* 90 Md. 674, 45 A. 1024 (1900); *Carozza v. Federal Finance & Credit Co.,* 149 Md. 223, 238, 131 A. 332, 338 (1925); *Rabinowich v. Eliasberg,* 159 Md. 655, 663, 152 A. 437, 440 (1930).

Maryland courts have not heretofore held that a court, based on an allegation of fraud, may enjoin a debtor from dissipating or disposing of assets pending a potential judgment. A number of other jurisdictions, however, have so ruled. Those courts ground their decisions on the reasonable necessity, in the interest of justice, of provisionally impounding the property of the debtor. *See* 116 A.L.R. 311. *See also Davenport v. Bartlett & Waring,* 9 Ala. 179 (1846); *Pearson v. Tucson Farms Co.,* 204 Ill.App. 276, (1917).

---

**5.** *Maskell v. Hill,* 189 Md. 327, 337, 55 A.2d 842, 846 (1947); C. Christopher Brown, *Introduction to Maryland Civil Litigation* § 1.34 (1982). Maryland abolished the procedural distinctions between law and equity in 1984, at which time law courts inherited the powers ordinarily cognizable at equity. It should be noted, however, that cases of testamentary construction, divorce, custody, corporate dissolutions, partnership terminations, and other matters heretofore vested exclusively in equity, do not trigger the full panoply of legal procedures such as a jury trial.

Those out-of-State decisions conflict with *Balls,* 69 Md. 388, 16 A. 18, and *Morton,* 68 Md. 545, 13 A. 341, but the conflict is of no concern because *Balls* and *Morton,* while still viable, are readily distinguished from the matter before us. In neither *Balls* nor *Morton* was fraud alleged; in neither *Balls* nor *Morton* did the defendants consent to the issuance of the injunction. We regard those differences as significant. The significance of an allegation of fraud was recognized by the Court of Appeals in *Kinsey* and *Frederick County Nat'l. Bank* in which the Court skillfully carved an exception from the *Balls* and *Morton* holdings and applied the principle that "where fraud exists, equity is equal to the occasion." *Crocker v. Pitti,* 179 Md. 52, 58, 16 A.2d 875, 877 (1940).

Patently, except as provided by statute, neither equity nor fundamental fairness will allow the prejudgment attachment of an alleged debtor's assets merely because a complaint asserts that the debtor has perpetrated a fraud. If that were the law, one can foresee that virtually every complaint would assert fraud, if for no other reason than to create a more advantageous position for the claimant by permitting him a measure of control over a defendant's assets. From that command position, a claimant could conceivably dictate a defendant's unconditional surrender. Hence, the use of prejudgment injunctions to freeze assets of a debtor must be cautiously scrutinized.

Nevertheless, there are extraordinary situations not covered by Cts. & Jud.Proc. Art. § 3–303 in which precisely that kind of precautionary action is not only desirable, but necessary.

We recognize that this precise issue has not been decided in Maryland heretofore, but equitable principles are broad, and a court of equity is not deprived of jurisdiction merely because the subject before it is new. *Wells v. Price,* 183 Md. 443, 452, 37 A.2d 888, 893 (1944); *Doe v. Commander, Wheaton Police Department,* 273 Md. 262, 273–74, 329

A.2d 35, 42 (1974); *see also* C.C. Brown, *The Law/Equity Dichotomy in Maryland,* 39 Md.L.Rev. 427, 436 (1980).

The Court of Appeals has recognized that equity attaches in "all cases of fraud where ... [equitable] intervention will result in avoiding the consequences of the fraud ... [except where] there is a full, adequate, and complete remedy at law." *Anderson v. Watson,* 141 Md. 217, 231, 118 A. 569, 574 (1922); *see also Baltimore Sugar Ref. Co. v. Campbell & Zell Co.,* 83 Md. 36, 40, 34 A. 369, 372 (1896). There is, as we have seen, no adequate remedy at law in the case at bar.

It has been said that a court is empowered to "look beyond the ability of damages to make a party whole and also consider the adverse party's financial ability to fulfill the legal remedy." *The Law/Equity Dichotomy in Maryland, supra,* at 434. To that end a court, of necessity, must be permitted to enjoin dissipation of assets from which recovery is to be made, particularly when the defendants consent.

Applying general equitable principles to the instant case, we hold that when fraud is alleged and the facts as pleaded indicate a substantial likelihood of fraud, as well as the probability that the defendants will, before judgment, dispose of assets fraudulently acquired, a court has jurisdiction to enjoin the defendants' dissipation of assets.

The injunctive relief is extraordinary, but the matter before us requires an extraordinary remedy. Accepting, *arguendo,* that the averments of the complaint are true, the fraud perpetrated is colossal. Millions of dollars of time deposits have allegedly been converted, diverted or perverted from Old Court depositors into the pockets of the defendants. The fraud case, however, has yet to be adjudicated on its merits, and the charges may prove unfounded. That issue is to be decided by another court at another time in another place.

## II

### *Consent Order Violation*

■ The consent order of August 5, 1985,[6] provided in pertinent part:

"During the pendency of this litigation, Defendants, ... and each of them with their consent are enjoined from removing, transferring alienating, pledging or otherwise impairing any assets in which Defendants have any direct or indirect interest, ... except upon application in writing to Plaintiff and the Court ... provided, however, Defendants may transfer assets without notice to Plaintiff or the Court as follows:

1. Each individual Defendant may transfer assets for ordinary and necessary personal living expenses not to exceed the level of expenses required to maintain Defendant's standard of living as of May 13, 1985;

2. Each Defendant may transfer assets in the ordinary course of business and to meet ordinary and necessary business expenses; and

3. Each Defendant may use his, her, or its assets to compensate attorneys for legal expenses at their normal hourly rates, plus disbursements."[7]

The transcript of the proceedings concerning the agreement to the consent order includes the following significant passages:

"I expect discovery to proceed in the ordinary course with cooperation by all counsel, and I have been assured by all counsel that they will cooperate to the extent they can cooperate. There is, of course, a criminal investigation which involves some of the defendants, and obviously there are constitutional rights that have to be abided by

---

6. Before Judge Kaplan in open court, all twenty-five defendants, through counsel, stated their consent to the order.

7. We have eliminated from the quoted portion of the order Judge Kaplan's initials which he signed when he deleted from or added to the text as submitted by MDIF.

in any civil matter which is pending during the time that the criminal investigation is pending.

. . . .

When I say ordinary, discovery will proceed . . . , I mean as far as a timetable is concerned, no motion will delay discovery except a motion that concerns a particular item of discovery. For example, if an interrogatory is inappropriate, . . . there will be a hearing on the question of whether it is an appropriate interrogatory; but other than that which concerns the particular item of discovery, there will be no delays. . . .

. . . .

I am going to ask each of the counsel for the defendants . . . if they agree to my statement concerning what the consent decree will be all about and to the discovery procedure. Let me start with Mr. Sandler.[8]

MR. SANDLER: . . . Your Honor has stated accurately the substance of the agreement. It was, of course, our position that this Court or any Court lacks the jurisdiction or power to grant the relief requested because the Maryland rules and the Maryland case law just, in our judgment, simply don't support the relief sought, but we pointed out . . . that there was no need to press that point, no need to engage in argumentation . . . because we have no intentions of taking all transfers and no intention of trying in any way to abscond with monies. *We are willing to enter into an agreement that Your Honor summarized, and we are willing to cooperate in that regard.* So the legal memoranda and points need not be touched on now, and we will reserve argument at a later date on other motions and issues." (Emphasis supplied.)

Thereafter, MDIF submitted a "First Request for Production of Documents" and interrogatories. The former were ten in number; the latter, eleven. To each of the requests

---

**8.** Mr. Sandler was counsel for Jeffrey A. Levitt, Karol Levitt, and eight corporations, partnerships or entities.

for production of documents, the Levitts interposed two objections: 1) compliance would cause "an undue hardship"; and 2) the Fifth Amendment protection against self-incrimination. Similarly, they refused to answer the interrogatories for the same reasons, in addition to that of relevancy. MDIF moved to amend the August 5, 1985, consent order so as to limit the Levitts' "personal living expenditures" to $1,000 per week.

MDIF asserted in its memorandum in support of the motion that the Levitts intended "to renege on their commitment" relative to discovery. The Levitts countered by asseverating that "neither ... [of them] agreed to provide the discovery requested by MDIF." Moreover, they contended in circuit court, as they do here, that they "may not be punished for asserting their Fifth Amendment privilege against self-incrimination."

A hearing was held. Testimony was taken. In argument to the circuit court, defense counsel likened the Levitts to the innocent lynch victims in the "Oxbow Incident." [9] Judge Kaplan obviously rejected that simile. He said:

> "As everyone is aware from the argument that took place today, ... I signed a consent order [on August 5, 1985]. One of the bases and probably an essential basis for my signing that order was the ability of the conservator and the Court to monitor the various expenses of the several defendants, including the Levitts. Without that ability I would have declined to sign the order. That ability has been hampered, if not virtually extinguished, in the Levitts' case by their exercise of their right, which they have under our constitution, the absolute right to exercise. They cannot be criticized in any way for their exercise of that right, but as a matter of fact the exercising of that right thwarts the Court's order of August 5,

---

**9.** A novel written in 1940 by Walter Van Tilburg Clark (1909–1971) that tells of the lynching of three alleged cattle rustlers just as word arrives of their innocence.

1985 and prevents the Court and the conservator from monitoring the expenses of the Levitts.

. . . .

In aid of the enforcement of the Court's order of August 5, 1985[,] ... I will sign a decree limiting the Levitts jointly and severally to an expenditure of one thousand dollars a week[10] plus the educational expenses for their children and plus their reasonable attorneys fees and disbursements. I will further order them not to withdraw from any funding source any sum in excess of a thousand dollars a week plus educational expenses for their children and reasonable attorney fees and disbursements without an order of this Court. I will further order them not to transfer any property in excess of that one thousand dollars a week plus educational expenses plus reasonable attorneys fees and disbursements without prior order of this Court. I will also order that the Levitts, Jeffrey and Karol, not incur any obligation on behalf of Old Court Savings and Loan, Inc. or any entity owned in whole or in part directly or indirectly by Old Court Savings and Loan, Inc."

We have carefully read the transcript of the September 18, 1985, hearing, and we fail to find any indication that the Levitts were penalized for invoking the Fifth Amendment. Contrary to the argument made by the Levitts, Judge Kaplan expressly said that the Levitts had "the absolute right to exercise" their constitutional protection and could not be criticized for employing that safeguard.

Judges are presumed to know the law. *Hebb v. State*, 31 Md.App. 493, 499, 356 A.2d 583, 587–588 (1976); *Samson v. State*, 27 Md.App. 326, 334, 341 A.2d 817, 823 (1975). *See Schowgurow v. State*, 240 Md. 121, 126, 213 A.2d 475, 479 (1965). Implicit in that presumption is that they apply it correctly to the facts before them. *Hebb*, 31 Md.App. at 499, 356 A.2d at 587–588. The Court of Appeals in *State v.*

---

**10.** Although counsel for the Levitts requested a greater sum, the court declined to grant it until the court was shown evidence of the need.

*Hutchinson,* 260 Md. 227, 233, 271 A.2d 641, 644 (1970), *rev'g Hutchinson v. State,* 9 Md.App. 41, 262 A.2d 321 (1970), declared that a judge, "by his legal training, traditional approach to problems, and the very state of the art of his profession, ... must early learn to perceive, distinguish and interpret the nuances of the law which are its 'warp and woof.' "

Judge Kaplan, a highly capable and experienced jurist, is aware of the importance the law attaches to the protection afforded by the Fifth Amendment. The judge is equally cognizant that the law does not permit sanctions against a person who invokes the Fifth Amendment. Nothing in the record evidences that the Levitts were punished for exercising their constitutional right against self-incrimination.

### III

*Modification of Consent Order*

The Levitts' argument on this issue is twofold. They maintain that when the circuit court, over their objection, modified the consent order, it vitiated that order. Hand in glove with that assertion, the Levitts contend that once the consent was removed by the court's unilateral modification, the court lost jurisdiction over the subject matter.

We have already resolved the issue of jurisdiction, and there is no need for revisiting that subject. Therefore, we restrict our discussion to whether the court improperly modified the consent order.

MDIF, as we have previously said, moved to modify the consent order for the purpose of limiting the Levitts' weekly living expenditures to $1,000. MDIF alleged that such a limitation was necessary because of the Levitts' lavish expenditures. The record shows that "recent large purchases of jewelry [were] ... made on August the 30th." There was an allegation by MDIF that,

"Jeffrey Levitt took three million six hundred thousand dollars of money out of Old Court, loaned it to a corporation that he owned, bought a piece of property, did not

sign any note. There were no loan documents. Then Mr. Levitt's corporation sold it back to Old Court Investment Corporation for a five hundred thousand dollar gain, but then when Mr. Levitt's corporation got the four million one hundred thousand dollars Mr. Levitt wouldn't sign a deed turning the property back to Old Court, so he's got the four million one and he's got the title also. This is the type of a man we are dealing with."

The Levitts offered no evidence. They simply asserted, through counsel, that $1,000 a week was inadequate, and that $4,000 per week was necessary to meet expenses. Judge Kaplan, based on the evidence presented to him, announced that one of the essential ingredients of his "signing the consent order of August 5, 1985, was the ability of the conservator and the Court to monitor the various expenses of ... the Levitts." He opined that the conservator's and the court's monitoring capability was "hampered, if not actually extinguished," by the Levitts' declination to comply with discovery. He made pellucid that he would sign an order "in aid of the enforcement of the ... order of August 5, 1985." The judge expressly limited the Levitts to an expenditure of $1,000 per week exclusive of certain carefully delineated costs. Judge Kaplan again informed the Levitts' counsel that, "when you can establish to me that there is some error in the amount set forth in ... [the] order because of ... [their] need, ... fixed needs, I will consider ... [the error as] a motion to modify the limitations of ... [the one thousand dollar a week] order."

The argument made in the Levitts' brief concerning the modification of the consent order is contained in but two short paragraphs:

"It is apparent that when a court modifies a consent order, over the objection of one of the parties, the order is no longer by consent. The consent is vitiated by the modification of the order.

In the case at bar, the Levitts consented to the Court's Order only in the form entered on August 5, 1985. The

Levitts objected to the modification of the Consent Order. Nevertheless, the Court modified the Consent Order in a material way and vitiated the consent. Once the consent was removed, the Levitts were entitled to demand proof of jurisdiction."

What is so apparent to the Levitts is not apparent to us. We think the circuit court could pass any order necessary to aid in the enforcement of an order it had previously issued. Once a court has taken jurisdiction and passed an appropriate order, to hold the court devoid of authority to amend that order so as to meet existing conditions would reduce the court to no more than an impotent debating forum.

When consent is given to the passage of a court order, implicit in that consent is a continuing authority on the part of the court to issue such further directives as may be necessary to implement the original order. That is a constant, unless by the terms of the consent it is otherwise provided. Were this not true, consent orders would have to provide in detail for each and every possibility that might arise. Obviously, that is more easily said than done, particularly when, as here, a conservator or receiver ventures into the unknown. Only by exploration does the explorer discover. The same is true of a conservator or receiver. Only after examining the records does he acquire the necessary information to chart the conservatorship or receivership in order to accomplish his mission—the greatest good for the greatest number.

## Case 2

### The Contempt

Ninety days following the imposition of the limitations on the Levitts' expenditures, MDIF petitioned the court to cite the Levitts for contempt. It alleged that Karol Levitt had withdrawn the sum of $34,000 from an account in the Commonwealth National Bank in Harrisburg, Pennsylvania, notwithstanding the September 18, 1985, order limiting the Levitts to an expenditure of $1,000 per week. The petition

further asserted that during the period commencing September 17, 1985 (the day before the order of specific limitation) through December 4, 1985, the Levitts had withdrawn the sum of $177,000 from four accounts at Yorkridge-Calvert Savings and Loan Association. The withdrawal of those funds, MDIF maintained, constituted a flagrant, wilful, deliberate and contemptuous disregard for the authority of the court.

The Levitts agreed that they had violated the court's orders of August 5, 1985, and September 18, 1985. The violations were, they said, "technical and not with intent to disobey the Court's order." They expressed a desire to present to the court "mitigating circumstances." The matter was heard before Judge Kaplan. The Levitts produced no witnesses and offered no evidence. The judge found "both Levitts guilty of contempt."

Jeffrey Levitt and his counsel then presented what they termed matters of mitigation for the court to consider before it imposed sentence. Mr. Levitt explained that he and his wife "for some reason ... believed that a thousand dollars was for personal living expenses...." He informed the court of the business expenses he was required to meet and explained the necessity of paying debts incurred prior to the court orders limiting expenditures. Obviously unconvinced or unmoved by that explanation, Judge Kaplan sentenced Jeffrey Levitt to eighteen months imprisonment and the payment of a fine of $200,000. Karol Levitt was jailed for a period of thirty days, to be served over fifteen consecutive weekends, and was fined $50,000.

For purposes of oral argument, we advanced the contempt appeal and consolidated it with the appeal in Case No. 1.

The contempt case posits five issues for our review. Three of them are but "instant replays" of those raised in

issues I and II of Case No. 1.[11]  There is no reason to rehash the subjects inasmuch as we deem Parts I and II of Case No. 1 to be dispositive.

We turn now to the other two questions which we have renumbered in order to maintain continuity.

  IV.  "Whether the Receiver satisfied the requirements for instituting proceedings of criminal contempt, when the Receiver acts in the capacity of a private party in these proceedings."

  V.  "Whether the penalty of eighteen (18) months incarceration constitutes cruel and unusual punishment for the offenses committed."

## IV

### The Receiver as Prosecutor

■ The Levitts assert that commencement of the contempt action was improper because MDIF "cannot file criminal contempt proceedings."  They argue that MDIF is a private party—a receiver—and as such cannot bring criminal contempt charges.  The argument seems to arrive here in virginal form inasmuch as it was not raised before Judge Kaplan.  The Levitts did contend before the circuit court that the proceeding should have been civil rather than criminal.  They did not, however, raise any question as to the standing of the conservator or receiver to institute the contempt charge.  Although the tune is the same, the lyrics are different.

---

11.  The three issues raised in the contempt case that we have already considered in Parts I and II of Case No. 1, are:
   1. Whether the Circuit Court for Baltimore City had jurisdiction to pass the "Freeze Order" of September 18, 1985, and the consent order of August 5, 1985.
   2. Whether the imposition of the "Freeze Order" of September 18, 1985, improperly penalized the Levitts for exercising their rights against self-incrimination.
   3. Whether the orders of August 5 and September 18, 1985, violated the Levitts' due process rights.

As we see it, the argument advanced by the Levitts must fall for three reasons. First, the record reveals that Judge Kaplan did, by order dated December 18, 1985, appoint counsel for MDIF as "prosecutors to prosecute the proceeding." His order expressly referred to Md.Rule P 4 d 1., which provides:

"The court may designate the State's attorney or any other member of the bar to prosecute...."

The advisor's note to that rule suggests that the intent was to confer upon courts the right to designate either the State's attorney or "an attorney in private practice" as prosecutor. That is precisely what Judge Kaplan did.

Second, a plea of guilty cures all defects in the proceedings, except jurisdiction. *Sutton v. State,* 289 Md. 359, 365, 424 A.2d 755, 758–759 (1981); *Treadway v. Warden,* 243 Md. 680, 682, 220 A.2d 907, 908 (1966); *Stevenson v. State,* 37 Md.App. 635, 638, 378 A.2d 209, 211 (1977). *See Deyermond v. State,* 19 Md.App. 698, 703, 313 A.2d 709, 712 (1974), *cert. denied,* 420 U.S. 966, 95 S.Ct. 1360, 43 L.Ed.2d 445 (1975); *Waller v. State,* 13 Md.App. 615, 624, 284 A.2d 446, 450 (1971). The jurisdictional question we have already resolved adversely to the Levitts. The plea of guilty, therefore, eliminated any argument the Levitts may have raised relative to the prosecutorial function of MDIF's counsel inasmuch as that is not a jurisdictional issue.

Third, the precise question now posited by the Levitts was not raised and decided in the trial court, and it is not properly before us. Md.Rule 1085.

V

*Cruel and Unusual Punishment*

■ Finally, the Levitts question whether the jail sentences and fines imposed upon them violated the Eighth Amendment's proscription against "cruel and unusual punishments." The Levitts argue that the gravity of the offense pales when viewed in light of the severity of the

punishment. The sentence, the Levitts contend, is disproportionate to the crime.

It is not the function of an appellate court to substitute its judgment for that of the trial judge. That this Court might have imposed a greater or lesser sentence matters not a whit. Ordinarily, we do not address the matter of the severity of the sentence. Indeed, we may not unless the sentence falls in the category of cruel and unusual, is *dehors* the statutorily prescribed limits, or is "grossly and inordinately disproportionate to the offense." *Lowery v. State,* 202 Md. 314, 321, 96 A.2d 20, 23 (1953); *Reid v. State,* 200 Md. 89, 93, 88 A.2d 478, 479, *cert. denied,* 344 U.S. 848, 73 S.Ct. 63, 97 L.Ed. 659 (1952).

Maryland courts have interpreted the phrase "grossly and inordinately disproportionate to the offense" to mean that the sentence was "dictated not by a sense of public duty, but by passion, prejudice, ill-will or any other unworthy motive." *Reid,* 202 Md. at 93, 88 A.2d at 479; *Gardner v. State,* 10 Md.App. 691, 694, 272 A.2d 410, 411, *cert. denied,* 261 Md. 724 (1971).

The Court in *Reid* said that a sentence "is not cruel and unusual if it is within the statutory limits." 200 Md. at 92, 88 A.2d at 479. The trial judge alone, the *Reid* Court opined, "has the right to determine the penalty within ... [the] limits." *Id.* Unless the legislature has otherwise provided, if the crime is at common law, "the only restrictions on sentence are that it be within the reasonable discretion of the trial judge and not cruel and unusual punishment." *Kirkorian v. State,* 233 Md. 324, 326, 196 A.2d 866, 867, *cert. denied,* 377 U.S. 945, 84 S.Ct. 1352, 12 L.Ed.2d 308 (1964); *Gardner,* 10 Md.App. at 693, 272 A.2d at 411.

The Supreme Court also accords "substantial deference ... to the discretion that trial courts possess in sentencing convicted criminals." *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637, 649 (1983). Moreover, "[o]utside the context of capital punishment, successful

challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382, 390 (1980); *Solem*, 463 U.S. at 289–290, 103 S.Ct. at 3009, 77 L.Ed.2d at 649.

Contempt is a common law crime for which the courts may impose any sanctions, subject only to the constitutional barrier against cruel and unusual punishment and to the case law proscribing penalties that are grossly and inordinately disproportionate to the offense. Viewing the record in the light of the trial court's authority to punish contempt, subject only to the limits we have discussed, we are unable to conclude that Judge Kaplan abused his discretion in sentencing the Levitts.

A court, when confronted by what the trial judge characterized as intentional, wilful and flagrant disregard for a judicial order, must act promptly and decisively to castigate the transgression against its authority. The punishment should restore the dignity of the court, impress upon the contemner the seriousness of the violation, and deter future misconduct.

Judge Kaplan said from the bench at the time he imposed the sentences on the Levitts that if he permitted the violations to go unpunished, he "might as well fold up shop." The legal system is dependent upon obedience to its command. Failure to adhere to lawful orders of courts undermines the legal structure and, if left unpunished, invites anarchy.

The action of the Levitts, admittedly contemptuous, warranted punishment. We are unable to say that the price they must pay for their defiance is cruel and unusual or disproportionate to the gravity of the offense.

*Summary*

1. A court exercising equity jurisdiction may enjoin fraud.

2. When a complaint demonstrates a substantial probability of fraud and that a defendant is likely to dispose of assets to avoid paying any resulting judgment, the court may exercise that jurisdiction by provisionally impounding the defendant's assets, particularly when the defendant consents to the injunction.

3. Once a consent injunction has been issued, the court, exercising its inherent powers, may issue additional orders when necessary to implement the original injunction.

4. Our legal system is grounded on the principle of obedience to lawful judicial orders. Wilful failure to obey a court order is contemptuous and subjects the contemner to any punishment that is not constitutionally proscribed or inordinately disproportionate to the offense.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.