551 A.2d 477

Abraham TEFERI

v.

DUPONT PLAZA ASSOCIATES.

No. 464, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Jan. 5, 1989.

Gary S. Marx and Larry S. Solomon (Marx & Krame, on the brief), Washington, D.C., for appellant.

David Barmak (Claudis A. Pott and Sherman, Meehan & Curtin, P.C., on the brief) Washington, D.C., for appellee.

Argued before MOYLAN, KARWACKI and FISCHER, JJ.

KARWACKI, Judge:

On March 2, 1988, appellee, Dupont Plaza Associates (DPA), filed suit in the Circuit Court for Montgomery County against Abraham Teferi, appellant, seeking compensatory and punitive damages. DPA's three count complaint, alleging conversion, fraud, and breach of fiduciary duty, related that Teferi had embezzled over $50,000 from DPA while employed by it. DPA also moved for an *ex parte* injunction and interlocutory injunction enjoining Teferi from transferring or otherwise disposing of his assets under certain conditions prior to final judgment in the action. On the day the complaint was filed, Judge James S. McAuliffe, Jr. issued the requested *ex parte* injunction which complied with Rule BB72(b).[1] A hearing on the motion for interlocutory injunction was scheduled before Judge William C. Miller for March 14, 1988.

At the beginning of the hearing before Judge Miller, appellant moved to dissolve the *ex parte* injunction. Judge Miller declined to rule on that motion and directed appellant to Judge McAuliffe who, in a memorandum dated March 14, 1988, denied appellant's motion. After one and one-half days of testimony and the introduction of numerous exhibits, Judge Miller issued an interlocutory injunction. It is from these two orders that appellant now appeals. He raises two issues for our review:

I.   The circuit court (Miller, J.) erred in issuing an extraordinary prejudgment attachment-type injunction because

---

1.  Rule BB72(b) requires:

    An *ex parte* injunction shall be served forthwith on the adverse party by the quickest possible means; it shall give the adverse party leave to move for a hearing on not more than two days' notice; and it shall expire by its terms within such time after entry as the court may fix. Such time shall not exceed ten days, in case of a resident, and shall not exceed thirty-five days, in case of a nonresident. The court may within the time so fixed, for good cause shown, extend such time for one like period. If the party against whom the injunction is directed consents, the court may order such extension or extensions and for such time or times for which consent has been given.

it failed to apply the standard for such relief set forth in *Levitt v. State of Maryland Deposit Insurance Fund Corporation,* 66 Md.App. 524, 505 A.2d 140 (1986).

II. The circuit court (McAuliffe, J.) erred in not dissolving the *ex parte* injunction upon the defendant's uncontroverted evidence that the plaintiff intentionally failed to give notice to opposing counsel with whom it was negotiating.

We shall affirm the judgment that the interlocutory injunction should issue. We decline to address the second issue because of its mootness.

## FACTS

DPA is a limited partnership which owns and operates the Dupont Plaza Hotel (Hotel) in Washington, D.C. Appellant was employed by DPA as the controller for the hotel on October 24, 1983. He continued in that capacity until February 17, 1988, when he was suspended from his position without pay. As the controller, appellant was responsible for maintaining the hotel's books and records, transacting the hotel's banking business, including bank deposits and withdrawals, and supervising the payment of the hotel's employees.

In January of 1988, David Thomas, an operations analyst assigned to the hotel's accounting department, discovered that a check payable to the hotel for $1,305.25 from the Barclay Hotel had been received by the hotel but was not listed on the list which routinely recorded all checks received by the hotel on a given day. Mr. Thomas also noted a similar irregularity concerning another check for $1,243.55 payable to the hotel from the Center for Defense Information. Mr. Thomas reported these discrepancies to his superiors and an investigation was initiated. That investigation implicated Teferi in the discrepancies, and on February 17, 1988, Scott Murdoch, the hotel's general manager, suspended appellant from employment by DPA.

Immediately after Mr. Murdoch advised appellant of the suspension, he escorted Teferi to the controller's office so that he could collect his personal belongings before leaving the hotel. Mr. Murdoch briefly left appellant's office to make a telephone call. At that moment appellant attempted to destroy various documents contained in his office including cash control work sheets, journal vouchers, and financial statements. After appellant left the hotel, his office was secured. The mutilated documents were subsequently turned over to Randy Weaver, a certified public accountant in private practice, who was retained by the hotel to investigate the nature and extent of the suspected embezzlement.

At the hearing on the interlocutory injunction motion, Mr. Weaver was qualified as an expert witness and testified in detail as to the nature and extent of his analysis and as to his conclusions regarding the misappropriation of the hotel's funds by Teferi. In Weaver's opinion, Teferi had employed two principal methods to accomplish the embezzlement, both of which involved the hotel's "payroll exchange."

In order to fulfill a requirement of its union contract the hotel cashed the paychecks of certain employees each weekly payday. To do so, each payday a "payroll exchange fund" was withdrawn from the hotel's operating account. This fund was utilized to cash payroll checks endorsed by employees to the hotel. After all paychecks had been cashed, the remaining cash left from the fund plus the endorsed checks were customarily returned to the controller's safe for redeposit to the hotel's operating account. The combination of the remaining cash and checks should have equaled the total amount withdrawn from the payroll exchange fund. Testimony from other witnesses at the hearing indicated that appellant was the only one who knew the combination to the safe which was located in his office.

First, Mr. Weaver testified that on three occasions the payroll exchange fund of cash and endorsed checks was never redeposited into the hotel's operating fund. Nevertheless, in each instance the hotel's books, for which Mr.

Teferi was responsible, reflected that a $15,000 deposit to the operating account had been made. In order to cover the failure to redeposit these funds, monies were transferred from the hotel's savings account to the operating account. For example, Mr. Weaver determined that in November of 1987, $90,000 was transferred from the savings account to the operating account, while only a $75,000 transfer was recorded on the hotel's books. It was alleged that the appellant was the only person in the accounting department authorized to initiate transfers between these accounts.

Second, Mr. Weaver asserted that appellant cashed checks payable to the hotel with cash from the "payroll exchange fund" and then made false journal entries on the hotel's books to cover for the missing checks. For example, Weaver discovered that the $1,243.55 Center for Defense Information check had been cashed by Teferi through the "payroll exchange fund."

Appellant did not testify at the hearing because at that time criminal charges, arising out of the alleged embezzlement, were pending against him. Nevertheless, he vigorously cross-examined all witnesses presented by DPA and called four witnesses on his own behalf. Appellant asserted, based on the testimony of two co-workers, that he was not responsible for the deposit slips and journal entries in question. His counsel argued, without any supporting evidence, that appellant was suspended for reporting bookkeeping irregularities that his superiors were directing him to commit in order to "cook the books" so the hotel could acquire a 12.5 million dollar loan.

## I. Interlocutory Injunction

### A. Jurisdiction

The case *sub judice* is the first instance since our decision in *Levitt v. Maryland Deposit Insurance Fund*, 66 Md.App. 524, 505 A.2d 140 (1986), where we are asked to review a trial court's grant of a prejudgment injunction that conditionally impounds the appellant's assets. In its motion

for an interlocutory injunction, appellee asked the court to enjoin "defendant Abraham Teferi from removing, transferring, alienating, pledging or otherwise impairing any assets in which he has a direct or indirect interest ... pending a final adjudication in this case."[2]  Conceding that it could not proceed under the Maryland statute that authorizes prejudgment attachments in cases of fraud, Cts. & Jud. Proc.Code Ann. (1984 Repl.Vol., 1988 Supp.), § 3–303(e),[3] because that subsection is governed by § 3–304(b) which mandates that an attachment for fraud "may issue only in an action based on contract for liquidated damages," appellee argues that *Levitt* is controlling.

2. Both the *ex parte* injunction and interlocutory injunction that were issued in the instant case provided in pertinent part:

>    ORDERED that defendant Abraham Teferi shall be and he hereby is enjoined from removing, transferring, alienating, pledging or otherwise impairing any assets in which defendant has any direct or indirect interest, except upon application in writing to plaintiff and the Court as provided in paragraph 3 below; *provided, however,* that defendant may transfer assets without notice or application to plaintiff or the Court as follows:
>
>    (1) Defendant may transfer assets for his ordinary and necessary personal living expenses; and
>
>    (2) Defendant may use his assets to compensate attorneys for legal expenses *at their normal hourly rates,* plus disbursements.
>
>    (3) Plaintiff shall have two (2) business days from receipt by its counsel to respond to defendant's application to transfer assets for any reason other than those authorized by paragraphs 1 and 2 herein.  In the event plaintiff objects to defendant's proposed transfer, the parties shall attempt in good faith to resolve such objection to their mutual satisfaction.  Failing such resolution, a hearing shall be held on the matter.  Defendant shall be enjoined from making a transfer until such time as plaintiff waives its objection or a hearing is held on the matter.

3. The pertinent part of § 3–303 provides:

>    (a) In general.—An attachment before judgment may issue in any of the instances in this section.
>
>    . . . . .
>
>    (e) Fraud.—(1) If the debtor is about to assign, dispose of, conceal, or move his property or a portion of it from the State with intent to defraud his creditors; or
>    (2) If the debtor has done any of these acts, fraudulently contracted the debt or incurred the obligation which is subject of the pending action.

In *Levitt*, the appellants, Jeffrey and Karol Levitt, argued that the Circuit Court for Baltimore City was without subject matter jurisdiction to issue a prejudgment injunction impounding their assets.[4] The Levitts further maintained that even though they consented to the imposition of the injunction, the court was without jurisdiction to issue it because one cannot, by consent, confer jurisdiction upon a court. (*Citing Attorney Grievance Commission v. Hyatt,* 302 Md. 683, 690, 490 A.2d 1224 (1985)). Acknowledging that "Maryland Courts have not heretofore held that a court, based on an allegation of fraud, may enjoin a debtor from dissipating or disposing of assets pending a potential judgment," *Levitt, supra,* 66 Md.App. at 535, 505 A.2d 140, we held that the trial court did have jurisdiction to order such an injunction under the facts in *Levitt.* Speaking for the Court, Chief Judge Gilbert stated:

> Applying general equitable principles to the instant case, we hold that when fraud is alleged and the facts as pleaded indicate a substantial likelihood of fraud, as well as the probability that the defendants will, before judgment, dispose of assets fraudulently acquired, a court has jurisdiction to enjoin the defendants' dissipation of assets.

*Id.* at 537, 505 A.2d 140.

Appellant argues that *Levitt* carved out a very specific exception to the general rule against prejudgment attachment type injunctions as established in *Balls v. Balls,* 69 Md. 388, 16 A. 18 (1888). In *Balls* the Court of Appeals held that a court of equity could not, at the instance of a holder of a promissory note, enjoin the maker of the note from conveying his property on the ground that the object of such conveyance was to delay and hinder the creditor in collecting his debt, since the holder had not first obtained a judgment at law. The Court stated:

---

4. In the suit against the Levitts, MDIF alleged that they had "fraudulently misappropriated funds from Old Court and its subsidiaries and affiliates." It was further alleged that millions of dollars of time deposits were diverted from Old Court depositors into the pockets of the Levitts.

Except where changed by statute, it is an invariable rule that the holder of a debt cognizable at law cannot obtain relief in equity, until he has shown that his legal remedies are inadequate. If he seeks to subject real estate to the payment of his debt, he must obtain a judgment creating a lien upon it; if he is pursuing personal estate, he must obtain a lien by an execution on his judgment. When he has by these means acquired an interest in his debtor's property, he will be in a condition to ask the aid of a Court of equity; if, in other respects, he can show a case within its jurisdiction. *Wiggins v. Armstrong*, 2 Johns. Ch., 144; *Brinkerhoff v. Brown*, 4 Johns. Ch., 671; *Birely v. Staley*, 5 Gill & J., 432; *Griffith v. Frederick Co. Bank*, 6 Gill & J., 424. The Act of 1835, ch. 380, section 2, dispensed with the necessity of a judgment in all cases of proceedings in equity "to vacate any conveyance or contract or other act as fraudulent against creditors." This Act clearly has no application where the thing complained of has not been executed, but rests merely in contemplation or intention.

69 Md. at 389–90, 16 A. 18.

*Balls, Morton v. Grafflin*, 68 Md. 545, 562, 13 A. 341, 15 A. 298 (1888); *Frederick County National Bank v. Shafer*, 87 Md. 54, 59, 39 A. 320 (1898); and *Kinsey v. Drury*, 141 Md. 684, 689–90, 119 A. 646 (1922), all stand for the proposition that a court of equity does not have jurisdiction to enjoin a debtor from disposing of his property unless a court of law first enters judgment against him. "It would be practically equivalent to an attachment in equity, which is purely a creation of statute, and does not exist in this State." *Frederick County Nat'l Bank, supra,* 87 Md. at 59, 39 A. 320. Without statutory authority, fraud or other grounds of equity jurisdiction, a court of equity has no such power. *Harper v. Clayton*, 84 Md. 346, 354, 35 A. 1083 (1896). "A Court of Equity, however broad and far reaching its powers are, cannot create new rights, not before existing at law, and then take jurisdiction to pass upon and enforce them because the law affords no remedy." *Id.* at

352, 35 A. 1083. In none of these aforementioned cases was fraud alleged.

In *Levitt,* we distinguished these venerable cases and explained:

> ... *Balls* and *Morton,* while still viable, are readily distinguished from the matter before us. In neither *Balls* nor *Morton* was fraud alleged; in neither *Balls* nor *Morton* did the defendants consent to the issuance of the injunction. We regard those differences as significant. The significance of an allegation of fraud was recognized by the Court of Appeals in *Kinsey* and *Frederick County Nat'l. Bank* in which the Court skillfully carved an exception from the *Balls* and *Morton* holdings and applied the principle that "where fraud exists, equity is equal to the occasion." *Crocker v. Pitti,* 179 Md. 52, 58, 16 A.2d 8ʳ ˉ 877 (1940).
>
> Patently, except as provided by statute, neither equity nor fundamental fairness will allow the prejudgment attachment of an alleged debtor's assets merely because a complaint asserts that the debtor has perpetrated a fraud. If that were the law, one can foresee that virtually every complaint would assert fraud, if for no other reason than to create a more advantageous position for the claimant by permitting him a measure of control over a defendant's assets. From that command position, a claimant could conceivably dictate a defendant's unconditional surrender. Hence, the use of prejudgment injunctions to freeze assets of a debtor must be cautiously scrutinized.
>
> Nevertheless, there are extraordinary situations not covered by Cts. & Jud.Proc. Art. § 3–303 in which precisely that kind of precautionary action is not only desirable, but necessary.

*Levitt, supra,* 66 Md. at 536, 505 A.2d 140.

Teferi argues that this case, unlike the situation in *Levitt,* does not merit the extraordinary remedy of injunctive relief. He argues that the facts in the case *sub judice* do not meet the standard set out in *Levitt* to give the trial court jurisdiction to enjoin appellant's dissipation of fraudulently ac-

quired assets. Specifically, appellant asserts that the evidence before the court did not show: 1.) a "substantial likelihood" of fraud committed by Teferi; 2.) the probability that the appellant will dispose of assets before judgment; and 3.) the assets were fraudulently obtained. We disagree.

At the hearing Judge Miller found that "there is a likelihood that the plaintiff will succeed in its suit." The appellee did not have to prove its case by a preponderance of the evidence; DPA needed to show a likelihood of success on the merits. DPA called three witnesses at the hearing including Mr. Weaver, its expert witness. These witnesses testified as to the circumstances surrounding the alleged misappropriations. Mr. Weaver's testimony alone as recited, *supra*, shows a substantial likelihood that Teferi was involved in these discrepancies. Documentary evidence, which included ledgers, checks, and deposit slips, was introduced that linked Teferi to the transactions in question. Due to appellant's position at the hotel and the evidence of his sole control of the controller's safe and certain hotel records, there is a strong inference that appellant was involved in this fraud. Appellant called four witnesses at the hearing. He did not, however, refute the specific evidence offered by the appellee. His witnesses, at most, implied or speculated that other people could have been involved in the fraudulent transactions. They also mentioned a possible bias on the part of Mr. Thomas, one of DPA's witnesses. This evidence does not detract from the likelihood that Teferi committed fraud.

■ Appellant also argues that the facts do not indicate that Teferi will attempt to dispose of his assets before a final judgment is entered in the case. Appellant's wife testified as to Teferi's commitment to the community and denied the possibility that she or her husband planned to leave the area or dispose of assets prior to judgment. DPA offered the undisputed testimony of Mr. Murdoch and Mr. Thomas who both recounted the incident upon appellant's suspension when Teferi was momentarily left alone in his

office and started to tear up pertinent documents that have now been reconstructed and used in the case against him. Although circumstantial, this evidence supports the appellee's contention that Teferi may try to dispose of or conceal his assets before a final judgment is entered.

■ Next, appellant contends that the appellee did not show that the impounded assets were fraudulently acquired. The alleged embezzlement scheme of appellant took place over a period probably beginning in late 1987. Mr. Weaver estimated that appellant embezzled approximately $50,000 from the hotel. Mrs. Teferi testified that in August of 1987 she and her husband purchased a new home for $170,000.00, at a time when the appellant was earning approximately $40,000 per year, and that appellant recently purchased a Jeep four wheel drive vehicle. Again, we conclude that there seems to be a substantial likelihood that these items were purchased with the funds allegedly converted by appellant.

In further attempting to distinguish his case from *Levitt,* appellant argues that he did not consent to the imposition of the injunction, as did the Levitts. It is true that in *Levitt* we distinguished the case at bar from cases where fraud was not alleged or the defendants did not consent to the issuance of the injunction. Nevertheless, our decision in *Levitt* did not turn on the issue of consent. As the Levitts correctly argued, one cannot by consent confer subject matter jurisdiction upon a court. *Attorney Grievance Commission v. Hyatt,* 302 Md. 683, 690, 490 A.2d 1224 (1985); *Kawamura v. State,* 299 Md. 276, 282, 473 A.2d 438 (1984); *Anthony Plumbing of Md. v. Attorney General,* 298 Md. 11, 15–16, 467 A.2d 504 (1983); *Highfield Water Co. v. Wash. Co. San.,* 295 Md. 410, 414, 295 A.2d 371 (1983); *Smuck v. Anne Arundel County,* 55 Md.App. 163, 166, 461 A.2d 42 (1983). The Levitts' consent to the interlocutory injunction sought against them obviated the necessity of the court being convinced by substantial evidence that they had acquired assets fraudulently and were likely to dispose of those assets prior to final judgment in the

action. The court acquired jurisdiction in *Levitt* on the basis of specific facts *alleged*, and the Levitts' consent to the issuance of the injunction. In the instant case we hold that the court acquired jurisdiction based upon the substantial evidence *offered* at the hearing, notwithstanding appellant's opposition to the issuance of the interlocutory injunction.

### B. Issuance

■ Having determined that the court had jurisdiction to issue an interlocutory injunction against appellant, we now turn to whether the trial judge appropriately granted appellee's motion. The granting or denying of an injunction is within the sound discretion of the trial court and will not be disturbed on appeal unless that discretion has been abused. *Holiday Universal Club v. Montgomery County*, 67 Md. App. 568, 576, 508 A.2d 991 (1986); *Seci, Inc. v. Chafitz, Inc.*, 63 Md.App. 719, 725, 493 A.2d 1100 (1985). Upon our review of the record, we perceive no abuse of discretion by Judge Miller.

The Court of Appeals has held that the trial court should consider four factors in determining whether entry of an interlocutory injunction is proper:

1.) the likelihood that the plaintiff will succeed on the merits;

2.) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its ′refusal;

3.) whether plaintiff will suffer irreparable injury unless the injunction is granted; and

4.) the public interest.

*Department of Transportation v. Armacost*, 299 Md. 392, 404–05, 474 A.2d 191 (1984); *State Dep't v. Baltimore County*, 281 Md. 548, 554, 383 A.2d 51 (1977). Judge Miller specifically addressed each of these factors in rendering his

decision to issue the interlocutory injunction.[5] We need not further address the first factor, the likelihood of success on the merits, since this issue has been adequately discussed in Part I(A) of this opinion, *supra.* With regard to the second factor, the trial judge, in his oral opinion explaining his decision, reasoned that the injunction which prohibited appellant from transferring or disposing of his assets while allowing him to make expenditures for living expenses and reasonable attorney's fees, inconvenienced the appellant less than DPA would be if it obtained a judgment against Teferi and could not collect it because he had dissipated his assets. In relating the "convenience factor" to the third factor, the trial judge found that if Teferi were to dissipate his assets before judgment, this would "create the possibility of irreparable harm to the plaintiff." It is quite clear that a preliminary injunction will lie when it is necessary to preserve the status quo. *State Dep't v. Baltimore County, supra,* 281 Md. at 558, 383 A.2d 51. DPA sought to prevent "interim injury which would undermine the final disposition of the case." *Id.* at 559, 383 A.2d 51. The trial court here did not abuse its discretion in preserving the status quo and in ensuring that DPA had an adequate remedy after a trial on the merits.

On the fourth factor, the public interest concern, the trial judge stated:

The final question is does [sic]—what are the public policies involved, and certainly this comes into play in

---

**5.** In the interlocutory injunction Judge Miller prefaced his orders thusly:

Upon consideration of plaintiff's Motion for Interlocutory Injunction, the Affidavits filed herein, the testimony given and evidence adduced, and the arguments of counsel, and it appearing to the Court that (1) plaintiff is likely to succeed on the merits of the case; (2) plaintiff will suffer substantial, irreparable harm unless the status quo is preserved pending the trial of this matter (3) the harm to plaintiff which will result from refusing the injunction will be greater than the harm to defendant if it is granted; (4) the public interest will be served by granting the interlocutory injunction; and (5) plaintiff has filed a bond in the amount of $10,000 with the clerk of the Court, it is by the Court this 15th day of March, 1988 ...

weighing the possibility that the plaintiff doesn't want somebody to dispose of the possible fruits of the wrongdoing, and on the other hand they are weighing the policy that it is against public policy to unduly restrict the alienation of somebody's property.

The trial judge found, and we agree, that in this case the order to be issued did not "unduly" restrict appellant's normal use of his assets and therefore the policy against allowing him to dissipate the "fruits of his wrongdoing" was of greater public concern.

II. Ex Parte Injunction

■ Pursuant to its terms the *ex parte* injunction issued on March 2, 1988 expired ten days after its entry. Because the tenth day after March 2, 1988 was a Saturday, the injunction dissolved on the preceding Friday, March 11, 1988. Rule 1-203(b).[6] No extension was requested or granted. On March 14, 1988, Teferi moved that the *ex parte* order be dissolved. It had already dissolved by its own terms. A question is moot if, "at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Attorney General v. Anne Arundel School Bus Contractors Association*, 286 Md. 324, 327, 407 A.2d 749 (1979). Clearly, at the point the court was asked to dissolve the *ex parte* order, the issue was moot.

JUDGMENTS AFFIRMED;

COSTS TO BE PAID BY THE APPELLANT.

---

**6.** Rule 1-203(b) states:

> In determining the latest day for performance of an act which is required by these rules, by rule or order of court, or by any applicable statute, to be performed a prescribed number of days before a certain day, act, or event, all days prior thereto, including intervening Saturdays, Sundays, and legal holidays, are counted in the number of days so prescribed. The latest day is included in the determination unless it is a Saturday, Sunday, or legal holiday, in which event the latest day is the first preceding day which is not a Saturday, Sunday or legal holiday.